AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Southern District of Ohio

| | |
|---|---|
| State of Ohio, ex rel. Attorney General Dave Yost | ) ) ) ) |
| _Plaintiff(s)_ | ) ) |
| v. | ) Civil Action No. 2:22-CV-2700 |
| Aaron Michael Jones, et al | ) ) ) ) |
| _Defendant(s)_ | ) |

## SUMMONS IN A CIVIL ACTION

To: _(Defendant's name and address)_   Geist Telecom LLC
905 Broadway St.
Sheridan, WY 82801

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:   Erin B. Leahy
Christopher Belmarez
Ohio Attorney General's Office
30 East Broad Street, 14th Floor
Columbus, Ohio 43215

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

CLERK OF COURT

Date:  _____08/24/2022_____                    _____
Signature of Clerk or Deputy Clerk

## CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

### I. (a) PLAINTIFFS

State of Ohio, ex rel Ohio Attorney General Dave Yost

**DEFENDANTS**

Aaron Michael Jones

**(b)** County of Residence of First Listed Plaintiff   Franklin
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   Orange
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Erin Leahy (Ohio Attorney General, 30 E. Broad St., 14th Floor, Columbus, Ohio 43215, 614.752.4730)

Attorneys *(If Known)*

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- [ ] 1 U.S. Government Plaintiff
- [x] 3 Federal Question *(U.S. Government Not a Party)*
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity *(Indicate Citizenship of Parties in Item III)*

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated *or* Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated *and* Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 625 Drug Related Seizure of Property 21 USC 881 | [ ] 422 Appeal 28 USC 158 | [ ] 375 False Claims Act |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 365 Personal Injury - Product Liability | [ ] 690 Other | [ ] 423 Withdrawal 28 USC 157 | [ ] 376 Qui Tam (31 USC 3729(a)) |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 367 Health Care/ Pharmaceutical | | | [ ] 400 State Reapportionment |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | Personal Injury Product Liability | | **INTELLECTUAL PROPERTY RIGHTS** | [ ] 410 Antitrust |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | [ ] 368 Asbestos Personal Injury Product Liability | | [ ] 820 Copyrights | [ ] 430 Banks and Banking |
| [ ] 151 Medicare Act | [ ] 340 Marine | | | [ ] 830 Patent | [ ] 450 Commerce |
| [ ] 152 Recovery of Defaulted Student Loans (Excludes Veterans) | [ ] 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | [ ] 835 Patent - Abbreviated New Drug Application | [ ] 460 Deportation |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 370 Other Fraud | [ ] 710 Fair Labor Standards Act | [ ] 840 Trademark | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 371 Truth in Lending | [ ] 720 Labor/Management Relations | [ ] 880 Defend Trade Secrets Act of 2016 | [ ] 480 Consumer Credit (15 USC 1681 or 1692) |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 380 Other Personal Property Damage | [ ] 740 Railway Labor Act | | [ ] 485 Telephone Consumer Protection Act |
| [ ] 195 Contract Product Liability | [ ] 362 Personal Injury - Medical Malpractice | [ ] 385 Property Damage Product Liability | [ ] 751 Family and Medical Leave Act | **SOCIAL SECURITY** | [ ] 490 Cable/Sat TV |
| [ ] 196 Franchise | | | [ ] 790 Other Labor Litigation | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| | | | [ ] 791 Employee Retirement Income Security Act | [ ] 862 Black Lung (923) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | | [ ] 863 DIWC/DIWW (405(g)) | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 440 Other Civil Rights | **Habeas Corpus:** | | [ ] 864 SSID Title XVI | [ ] 893 Environmental Matters |
| [ ] 220 Foreclosure | [ ] 441 Voting | [ ] 463 Alien Detainee | | [ ] 865 RSI (405(g)) | [ ] 895 Freedom of Information Act |
| [ ] 230 Rent Lease & Ejectment | [ ] 442 Employment | [ ] 510 Motions to Vacate Sentence | | **FEDERAL TAX SUITS** | [ ] 896 Arbitration |
| [ ] 240 Torts to Land | [ ] 443 Housing/ Accommodations | [ ] 530 General | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 535 Death Penalty | **IMMIGRATION** | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 950 Constitutionality of State Statutes |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | **Other:** | [ ] 462 Naturalization Application | | |
| | [ ] 448 Education | [ ] 540 Mandamus & Other | [ ] 465 Other Immigration Actions | | |
| | | [ ] 550 Civil Rights | | | |
| | | [ ] 555 Prison Condition | | | |
| | | [ ] 560 Civil Detainee - Conditions of Confinement | | | |

### V. ORIGIN *(Place an "X" in One Box Only)*

- [x] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from Another District *(specify)*
- [ ] 6 Multidistrict Litigation - Transfer
- [ ] 8 Multidistrict Litigation - Direct File

### VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
47 USC 227
Brief description of cause:
Violations of the Telephone Consumer Protection Act, Telemarketing Sales Rule, and pendant state claims.

### VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $
9999

CHECK YES only if demanded in complaint:
JURY DEMAND: [ ] Yes [x] No

### VIII. RELATED CASE(S) IF ANY

*(See instructions)*

JUDGE                    DOCKET NUMBER

DATE
Jul 7, 2022

SIGNATURE OF ATTORNEY OF RECORD
s/ Christopher J. Belmarez

**FOR OFFICE USE ONLY**

RECEIPT #       AMOUNT       APPLYING IFP       JUDGE       MAG. JUDGE

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

### Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.(a)** **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

  **(b)** **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

  **(c)** **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.Cv.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.
United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.
United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.
Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.
Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If there are multiple nature of suit codes associated with the case, pick the nature of suit code that is most applicable. Click here for: Nature of Suit Code Descriptions.

**V.** **Origin.** Place an "X" in one of the seven boxes.
Original Proceedings. (1) Cases which originate in the United States district courts.
Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441.
Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.
Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.
Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.
Multidistrict Litigation – Transfer. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407.
Multidistrict Litigation – Direct File. (8) Check this box when a multidistrict case is filed in the same district as the Master MDL docket.
**PLEASE NOTE THAT THERE IS NOT AN ORIGIN CODE 7.** Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553 Brief Description: Unauthorized reception of cable service.

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.
Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.
Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

**Date and Attorney Signature.** Date and sign the civil cover sheet.

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF OHIO

**State of Ohio,** *ex rel.*                                    No. 2:22-CV-2700
**Attorney General Dave Yost,**

      Plaintiff,                                    **COMPLAINT FOR**
                                                          **PERMANENT INJUNCTION,**
      v.                                            **DAMAGES AND OTHER**
                                                          **EQUITABLE RELIEF**

**Aaron Michael Jones,** also known as
Mike Jones individually and as an actual
or *de facto* owner, officer and/or member
of Technologic USA, Inc., Technologic,
Inc., Connective MGMT Inc., Virtual
Telecom, Inc., Virtual Telecom Kft, Davis
Telecom, Inc., Davis Telecom, Inc., Tech
Direct, LLC, Posting Express, Inc., Sumco
Panama USA, Sumco Panama SA., Mobi
Telecom LLC, Geist Telecom LLC, and
Fugle Telecom LLC,

**Roy Melvin Cox Jr.,** individually and as an
actual or *de facto* owner, officer and/or
member of Technologic USA, Inc.,
Technologic, Inc., Connective MGMT Inc.,
Virtual Telecom, Inc., Virtual Telecom Kft,
Davis Telecom, Inc., Davis Telecom, Inc.,
Tech Direct, LLC, Posting Express, Inc.,
Sumco Panama USA, Sumco Panama
SA., Mobi Telecom LLC, Geist Telecom
LLC, and Fugle Telecom LLC,

**Stacey Eunjin Yim,** individually and as owner
and officer of Posting Express Inc.; and an
actual or *de facto* owner officer, and/or
member of Technologic USA, Inc.,
Technologic, Inc., Connective MGMT Inc.,
Virtual Telecom, Inc., Virtual Telecom Kft,
Davis Telecom, Inc., Davis Telecom, Inc.,
Tech Direct, LLC, Sumco Panama USA,
Sumco Panama SA., Mobi Telecom LLC,
Geist Telecom LLC, and Fugle Telecom LLC,

1

**Julie Kathryn Bridge,** individually and as an officer and/or member of Technologic USA, Inc., Virtual Telecom, Inc., Davis Telecom, Inc., and Mobi Telecom, LLC,

**June Ann Batista,** individually and as an officer and/or member of Tech Direct LLC,

**Jovita Migdaris Cedeno Luna,** also known as Migdaris Cedeno, also known as Jovita Migdaris, also known as Jovita Cedeno, individually and as an officer and/or member of Sumco Panama SA.,

**Livia Szuromi,** individually and as an officer and/or member of Sumco Panama SA, Sumco USA, Davis Telecom, Inc., and Davis Telecom Inc.,

**Andrea Horvath,** also known as Andrea Baloghne Horvath, also known as Baloghne Horvath Andrea, individually and as an officer of Virtual Telecom, Inc. and Virtual Telecom Kft,

**Technologic USA, Inc.,** a Wyoming for profit corporation,

**Technologic, Inc.,** a foreign corporation,

**Connective MGMT Inc.,** also doing business as XYSM, a Nevada corporation,

**Virtual Telecom Inc.,** a Wyoming corporation,

**Virtual Telecom Kft,** also doing business as XYSM, a foreign corporation,

**Davis Telecom, Inc.,** a former Wyoming corporation,

**Davis Telecom, Inc.,** a foreign corporation,

**Tech Direct LLC,** a Wyoming limited

2

liability company,

**Posting Express, Inc.,** a Nevada for profit corporation,

**Sumco Panama USA,** a Wyoming corporation,

**Sumco Panama SA.,** a foreign corporation,

**Mobi Telecom LLC,** a Wyoming limited liability company,

**Geist Telecom LLC,** a Wyoming limited liability company, and

**Fugle Telecom LLC,** a Wyoming limited liability company,

    Defendants.

**INTRODUCTION**

Intrusive and unlawful robocalls are a nuisance to society that have changed the way Americans use their phones. After being plagued by multiple robocalls a day, gone are the times of trusting caller ID and hearing a live person on the other end of the call. We have come to the point where people will ignore calls from unknown numbers, even in emergent situations when answering the phone could save their lives.[1] The acts and practices of Defendants in this case illustrate why Americans have grown so frustrated with unlawful robocalls.

Since at least July of 2018, each of the Defendants,[2] acting individually and collectively through a common enterprise, have participated in an unlawful robocall operation that bombarded American consumers with *billions* of robocalls. At times, Defendants initiated over 77 million robocalls per day for the purpose of generating sales leads, many times in relation to the sale of Vehicle Service Contracts ("VSCs") that are deceptively marketed as "car warranty" plans. At issue in this case are the hundreds of millions of robocalls this Complaint alleges Defendants directed at Ohioans, totaling at least 800 million call attempts.

Defendants were engaged in a complex robocall lead generation scheme designed to conceal both who is responsible for the generation of hundreds of millions of robocalls, as well as how money flows between Defendants. To accomplish this deceptive scheme, each Defendant performed different, though sometimes overlapping, functions to create layers of protection for the primary beneficiaries of the scheme, individual Defendants Jones, Cox, and Yim.

In furtherance of the common enterprise, Defendants collectively engaged in deceptive and

---

[1] *See generally* Bill Chappell, *A Lost Hiker Ignored Rescuers' Phone Calls, Thinking They Were Spam*, NPR, Oct. 26, 2021, https://www.npr.org/2021/10/26/1049252333/lost-hiker-mount-elbert-colorado-ignored-rescuers-phone-calls (Lost hiker did not answer phone from rescue unit because he did not recognize the number).
[2] *See* Appendix A.

4

abusive telemarketing practices by initiating robocalls that failed to disclose the identity of the caller, misrepresented the nature and characteristics of the product or service being offered, and made false or misleading statements to induce call recipients to purchase goods or services. Moreover, Defendants inconvenienced and interrupted consumers' lives by entirely disregarding consumers' enrollment on the National Do Not Call Registry ("DNC Registry"), ignoring requests to cease calling, and regularly changing caller ID numbers to evade call blocking efforts.

Plaintiff alleges multiple violations of federal and state telemarketing laws perpetrated by Defendants through an operation that was complex by design to avoid detection. Each Defendant is liable for his, her, or its part in the common enterprise for working in concert to disrupt the lives of millions of Ohioans though their robocall scheme.

## PREAMBLE

Plaintiff, the State of Ohio, *ex rel.* Attorney General Dave Yost ("State of Ohio"), alleges:

1.      The State of Ohio brings this action pursuant to the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(g); the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. § 6103(a), for Defendants' violations Federal Trade Commission's ("FTC") Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310;  the Ohio Consumer Sales Practices Act ("Ohio CSPA"), Ohio Rev. Code § 1345.07; and the Ohio Telephone Solicitation Sales Act ("Ohio TSSA"), Ohio Rev. Code § 4719.12, to obtain, permanent injunctive relief, damages, civil penalties and other equitable relief for Defendants' acts or practices that violate federal and state laws as described below.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a), 1355, and over the state law claims pursuant to 28 U.S.C. § 1367.

3.     The Defendants, in connection with the matters alleged herein, transact or have transacted business in the State of Ohio, and in this district; caused tortious injury by an act or omission in the State of Ohio, and in this district; caused tortious injury in this state by an act or omission outside this state, and regularly does or solicits business, or otherwise engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in the State of Ohio, and in this district; and caused tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when he, she, or it might reasonably have expected that some person would be injured thereby in the State of Ohio, and in this district.

4.     Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2), (b)(3) and (c), 1395(a), 47 U.S.C. § 227(g)(4), and 15 U.S.C § 6103(e) as a substantial part of the events or omissions giving rise to the claims alleged in this Complaint occurred in this District, and violations alleged in this Complaint occurred in this district.

5.     The State of Ohio notified the Federal Communications Commission ("FCC") of this civil action pursuant to 47 U.S.C. § 227(g)(3).

6.     The State of Ohio notified the FTC of this civil action pursuant to 15 U.S.C. § 6103(b).

## COMMERCE

7.     At all times relevant to this Complaint, Defendants maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## PLAINTIFF

8.     The State of Ohio, by and through its Attorney General, Dave Yost, brings this action in federal district court under 47 U.S.C. § 227(g)(l) on behalf of residents of the State of Ohio to enjoin violations of and enforce compliance with the TCPA, and to obtain damages of five hundred

dollars ($500) for each violation, and up to treble that amount for each violation committed willfully and knowingly.

9.    The State of Ohio, as parens patriae, is authorized by 15 U.S.C. § 6103(a) to file civil actions in federal district court to enjoin violations of and enforce compliance with the TSR and to obtain damages, restitution, or other compensation on behalf of residents of the State of Ohio, or to obtain other relief as the Court may deem appropriate.

10.    The State of Ohio is authorized under the laws of the State of Ohio to file civil actions to obtain declaratory judgments, enjoin violations, and seek orders for consumer damages, civil penalties of twenty-five thousand dollars ($25,000) for violations of the Ohio CSPA, O.R.C. §§ 1345.01 et seq. and its substantive rules, O.A.C. §§ 109:4-3-01 et seq., to seek civil penalties of not less than one thousand ($1,000) nor more than twenty-five thousand dollars ($25,000) for each violation of the Ohio TSSA, O.R.C. §§ 4719.01 et seq., as well as investigative costs, reasonable attorneys' fees and any other appropriate relief.

## DEFENDANTS

### *The Corporate Defendants*

11.    Defendant **Technologic USA, Inc.** ("Technologic USA" and a "Financial Shell Defendant") is a Wyoming corporation formed in April 2015 with its principal place of business in Cheyenne, Wyoming.

12.    Defendant **Technologic, Inc.** ("Technologic" and a "Call Originator Defendant" and "VoIP Provider Defendant") is a foreign corporation with its principal place of business in Panama City, Panama.

13.    Defendant **Connective MGMT Inc.** ("Connective MGMT" and a "Financial Shell Defendant"), also doing business as XYSM, is a Nevada corporation formed in November 2015

with its principal place of business in Las Vegas, Nevada.

14.     Defendant **Virtual Telecom Inc.** ("Virtual US" and a "Financial Shell Defendant") is a Wyoming corporation company formed in June 2016 with its principal place of business in Cheyenne, Wyoming.

15.     Defendant **Virtual Telecom Kft** ("Virtual Hungary" and a "Call Originator Defendant" and "VoIP Provider Defendant"), also doing business as XYSM, is a foreign corporation with its principal place of business in Budapest, Hungary.

16.     Defendant **Davis Telecom, Inc.** ("Davis Panama" and a "Call Originator Defendant" and "VoIP Provider Defendant") is a foreign corporation formed in October 2017 with its principal place of business in Panama City, Panama.

17.     Defendant **Davis Telecom, Inc.** ("Davis US" and a "Financial Shell Defendant") is a former Wyoming corporation formed in June 2018 with its principal place of business in Cheyenne, Wyoming.  Though Davis US has continued its business operations, Defendant Szuromi, as president of Davis US, formally dissolved the corporation with the Wyoming Secretary of State's Office in April of 2021.

18.     Defendant **Tech Direct LLC** ("Tech Direct" and a "Financial Shell Defendant") is a Wyoming limited liability company formed in February 2019 with its principal place of business in Sheridan, Wyoming.

19.     Defendant **Posting Express, Inc.** ("Posting Express" and a "Financial Shell Defendant") is a Nevada corporation formed in May 2019 with its principal place of business in Las Vegas, Nevada.

20.     Defendant **Sumco Panama USA** ("Sumco USA" and a "Financial Shell Defendant") is a Wyoming corporation formed in January 2020 with its principal place of business in Sheridan,

Wyoming.

21.     Defendant **Sumco Panama SA.,** ("Sumco Panama" and a "Call Originator Defendant") is a foreign corporation formed in March 2012 with its principal place of business in Panama City, Panama.

22.     Defendant **Mobi Telecom, LLC** ("Mobi" and a "Call Originator Defendant" and "VoIP Provider Defendant") is a Wyoming limited liability company formed in June 2020 with its principal place of business in Sheridan, Wyoming.

23.     Defendant **Geist Telecom LLC** ("Geist" and a "Call Originator Defendant" and "VoIP Provider Defendant") is a Wyoming limited liability company formed in October 2020 with its principal office in Sheridan, Wyoming.

24.     Defendant **Fugle Telecom LLC** ("Fugle" and a "Call Originator Defendant" and "VoIP Provider Defendant") is a Wyoming limited liability company organized in January 2021 with its principal office in Sheridan, Wyoming.

### *The Individual Defendants*

25.     Defendant **Aaron Michael Jones** ("Jones" and an "Individual Defendant"), also known as Mike Jones, is an actual or *de facto* owner, officer or member of all Corporate Defendants. At times material to this Complaint, acting alone or in concert with others, Jones had the authority and responsibility to prevent or correct the unlawful telemarketing practices of each of the Corporate Defendants, and has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of each Call Originator and Financial Shell Defendants, including the acts and practices set forth in this Complaint. Jones is the spouse or domestic partner to Defendant Yim, and they reside together in Irvine, California.

26.     Defendant **Roy Melvin Cox, Jr**. ("Cox" and an "Individual Defendant") is an actual or *de*

*facto* owner, officer or member of the Corporate Defendants. At times material to this Complaint, acting alone or in concert with others, Cox has had the authority and responsibility to prevent or correct the unlawful telemarketing practices of each Call Originator and Financial Shell Defendants, and has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of each Call Originator and Financial Shell Defendants, including the acts and practices set forth in this Complaint. Cox resides in Tustin, California.

27.     Defendant **Stacey E. Yim** ("Yim" and an "Individual Defendant") is an actual or *de facto* owner, officer or member of the Corporate Defendants. At times material to this Complaint, acting alone or in concert with others, Yim has had the authority and responsibility to prevent or correct the unlawful telemarketing practices of each Call Originator and Financial Shell Defendants and has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of each Call Originator and Financial Shell Defendants, including the acts and practices set forth in this Complaint. Yim is the spouse or domestic partner to Defendant Jones, and they reside together in Irvine, California.

28.     Defendant **Julie K. Bridge** ("Bridge" and an "Individual Defendant") is an officer and member of Technologic USA, Virtual US, Davis US, and Mobi Telecom. At times material to this Complaint, acting alone or in concert with others, Bridge has had the authority and responsibility to prevent or correct the unlawful telemarketing practices of Technologic USA, Virtual US, Davis US, and Mobi Telecom, and has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Technologic USA, Virtual US, Davis US, and Mobi Telecom, including the acts and practices set forth in this Complaint. Bridge resides in Upland, California.

29.     Defendant **June Batista** ("Batista" and an "Individual Defendant") is an officer and

10

member of Tech Direct. At times material to this Complaint, acting alone or in concert with others, Batista has had the authority and responsibility to prevent or correct the unlawful telemarketing practices of Tech Direct, and has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Tech Direct, including the acts and practices set forth in this Complaint. Batista resides in Costa Mesa, California.

30.     Defendant **Jovita Migdaris Cedeno Luna** ("Cedeno" and an "Individual Defendant"), also known as Migdaris Cedeno, also known as Jovita Migdaris, also known as Jovita Cedeno, is an officer and director of Sumco Panama. At times material to this Complaint, acting alone or in concert with others, Cedeno has had the authority and responsibility to prevent or correct the unlawful telemarketing practices of Sumco Panama, and has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Sumco Panama, including the acts and practices set forth in this Complaint. On information and belief Cedeno resides in Tustin, California and in Panama City, Panama.

31.     Defendant **Livia Szuromi** ("Szuromi" and an "Individual Defendant") is an officer and director of Sumco Panama, Sumco USA, Davis US, and Davis Panama. At times material to this Complaint, acting alone or in concert with others, Szuromi has had the authority and responsibility to prevent or correct the unlawful telemarketing practices of Sumco Panama, Sumco USA, Davis US, and Davis Panama and has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Sumco Panama, Sumco USA, Davis US, and Davis Panama, including the acts and practices set forth in this Complaint. On information and belief Szuromi resides Tustin, California and in Panama City, Panama.

32.     Defendant **Andrea Horvath** ("Horvath" and an "Individual Defendant"), also known as Andrea Baloghne Horvath, also known as Baloghne Horvath Andrea, is officer and director of

11

Virtual US and Virtual Hungary. At times material to this Complaint, acting alone or in concert with others, Horvath has had the authority and responsibility to prevent or correct the unlawful telemarketing practices of Virtual US and Virtual Hungary, and has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of each of Virtual US and Virtual Hungary, including the acts and practices set forth in this Complaint. On information and belief, Horvath resides in Budapest, Hungary.

## CASE BACKGROUND

33.     Each of the Defendants, acting individually, as well as collectively through the common enterprise, have participated in an unlawful robocall operation that bombarded Ohio residents with at least 800 million illegal robocalls from July 2018 through at least July 2021. This call volume is equivalent to calling every person in Cincinnati twice a day for over 1,000 consecutive days without consent.

34.     Defendants, through their "lead generation" services, provided prequalified/prescreened leads in which a robocall advertised the availability of "goods or services," or otherwise was meant to induce the recipient of the call to purchase goods or services when he or she met certain criteria. When possible, Defendants provided clients with live transfer of the lead while the prospective consumer was still on the phone with Defendants or their agents. By providing lead generation services, Defendants arranged for VSC marketers to provide goods or services to customers in exchange for consideration.

35.     In the same period, Call Originator Defendants originated hundreds of millions of robocalls aimed at residents of Ohio. A prerecorded message greeted individuals who answered and then prompted them to respond by pressing number options. If the individual responded, Defendants would prescreen and, when possible, instantaneously transfer the individual to one of their clients

paying for sales leads.

36.     Call Originator Defendants contracted with a number of different Voice over Internet Protocol ("VoIP") service providers to obtain service through which they initiated the robocalls to call recipients.  VoIP is a technology which allows users to make voice calls using broadband internet instead of analog or cellular phone services.  Further, Call Originator Defendants used internationally-based cloud servers to mask the origin of the calls.

37.     To conceal their robocall operation and in furtherance of the common enterprise, Call Originator Defendants, except Sumco Panama, registered with the FCC as Interconnected VoIP service providers (collectively "VoIP Provider Defendants" where necessary to delineate between the overlapping Call Originator Defendants).

38.     Technologic USA, Connective MGMT, Virtual US, Tech Direct, Sumco USA, Davis US, and Posting Express (collectively "Financial Shell Defendants") obtained bank accounts that facilitated receiving money from Call Originator Defendants' clients, paid proceeds to the Individual Defendants, and paid for services necessary to the common enterprise.  Financial Shell Defendants were owned, operated, directed, and otherwise controlled by the Individual Defendants and were also purported to be owned, operated, directed, and otherwise controlled by the below described Straw Directors.

39.     Jones and Cox, the ringleaders of this common enterprise, are recidivist robocallers.  Cox was sued by the FTC in 2011 for strikingly similar business practices.[3]  Jones has been sued three times for unlawful robocalling, twice by the FTC in 2017 and 2019 and once by the State of Texas in 2011.[4]  By engaging in the scheme alleged in this Complaint, Jones and Cox are violating

---

[3] *See United States v. Cox*, No. 8:11-cv-01910 (C.D. Cal.).
[4]  See, *FTC v. Aaron Michael Jones*, No. 8:17-cv-00058 (C.D. Cal); *FTC v. Pointbreak Media, LLC*, No. 0:18-cv-

multiple permanent injunctions that banned them from engaging in telemarketing or assisting others engaged in telemarketing.[5]

40.      Jones, Cox, Yim, Bridge, Batista, Cedeno, Szuromi, and Horvath (collectively "Individual Defendants"), received a monetary benefit for taking part in the lead generation common enterprise.  Individual Defendants performed various functions in the enterprise such as owning and operating companies involved in the complex scheme, directing the same companies, or otherwise participating in and facilitating the same.

41.      Danila Hardon, Maria Alejandra Gonzalez, Davinder Singh, and Adam Radimiri (collectively "Straw Directors") are additional individuals or aliases involved in the common enterprise.  These Straw Directors' names were used to sign documents and appear on FCC filings. They, however, do not appear to receive any compensation from the Defendants.  Moreover, nothing in the Plaintiff's investigation provides evidence that the Straw Directors are individuals that actually exist.  The Straw Directors—or the use of their names—provide clear links between Defendants in the common enterprise and show the interconnectedness of the Defendants.

## DEFENDANTS' BUSINESS ACTIVITIES

### *Deceptive Robocalls*

42.      Defendants, directly or through one or more intermediaries, have engaged in the business of generating and selling sales leads, through a complex robocall scheme and other telemarketing, for a variety of products and services.  Defendants receive compensation from the scheme on a per-lead basis and, at times, also receive commissions on sales that result from provided leads.

43.      Defendants blasted hundreds of thousands of VSC robocalls per day that deceptively

---

61017 (S.D. Fla.); *State of Texas v. SCM Media, Inc,* No. A-09-cv-387 (W.D. Tex).
[5] See, *FTC v. Aaron Michael Jones*, No. 8:17-cv-00058 (C.D. Cal); *State of Texas v. SCM Media, Inc,* No. A-09-cv-387 (W.D. Tex).

induced consumers to stay on the line for Defendants to connect them as leads to VSC marketers.

44.     Consumers who answered Defendants' robocalls were greeted with the following prerecorded message, or a very similar version:

> This is an urgent message for the vehicle owner. We have been trying to reach you about your car's extended warranty. You should have received something in the mail about your car's extended warranty. Since we have not gotten a response, we are giving you a final courtesy call before we close out your file. Press two to be removed and be placed on our do not call list, press one to speak with someone about possibly extending or reinstating your car's warranty. Press one to speak with a warranty specialist.

45.     Consumers who "press one" are typically transferred to live operators in call centers or to an automated system employing interactive voice response or artificial intelligence bot technology to "qualify" or pre-screen the consumers' interest in purchasing a VSC. In some instances, consumers who hold for a live person to request no further calls end up with abrupt disconnections rather than having their do not call requests recorded by the telemarketers.

46.     During the qualifying or prescreening process, Call Originator Defendants' live operator or the automated response technology identify the telemarketer or seller generically as the "vehicle service department" or a similar name. Consumers are then asked to "verify" the year, make, and model of their vehicle and the mileage so that the telemarketer can "look up their file."

47.     Consumers who provide answers to the pre-screening questions are informed that the call will be transferred to a "licensed" or "authorized" representative, at which point consumers are transferred to VSC marketers to complete the sale. This process is known in the telemarketing industry as a "live transfer lead." Generally, in the industry, if there is no VSC sales agent available to accept the live transfer lead, any contact information gleaned from the potential lead is still sold.

48.     In numerous instances, Call Originator Defendants initiated robocalls that misrepresented, directly or by implication, through their prerecorded messages that:

      a.      they are calling from or on behalf of consumers' car dealers or manufacturers;

      b.      they know that the consumers' original warranties are about to expire;

      c.      they sell extensions or can reinstate the consumers' original warranties; and

      d.      the purpose of the call is to follow up on existing "files" or business relationships with the consumers.

49.      In fact, the Call Originator Defendants:

      a.      are not calling from or on behalf of consumers' car dealers or manufacturers;

      b.      do not know whether the consumers' car warranties are about to expire;

      c.      have no authority or ability to "extend" or "reinstate" consumers' original warranties;

      d.      are not calling to follow up on an existing business relationship; and

      e.      are misrepresenting the true purpose of the call, which is to solicit the sale of VSCs, which do not have the same legal characteristics and protections of a manufacturer's warranty.

50.      Between 2018 and 2021, Financial Shell Defendants, received over $12.9 million from at least 13 entities that sell VSCs to Ohio consumers.

51.      Davis Panama, Tech Direct, Virtual US, and Virtual Hungary entered into agreements with VSC marketers, in which they agreed to provide the VSC marketers with "billable leads," which were generated through methods including the use of robocalls.

52.      For example, in 2020, a Florida VSC marketer that solicited Ohio residents paid over $1.4 million to Tech Direct, Virtual US and Davis US.  In January 2020, Straw Director Gonzalez signed two contracts, one on behalf of Tech Direct and one on behalf of Virtual Hungary, to provide "billable leads" to the VSC marketer.  In October 2020, Straw Director Hardon signed a contract on behalf of Davis Panama with the Florida VSC marketer.  The three contracts were nearly identical, described the marketed product as "Vehicle Service Coverage," stated that the purpose was to generate calls for the Florida VSC marketer, and described the nature of the service provided to the VSC marketers as leads, i.e. "sourcing consumers."  The contracts, in part, stated:

> **Vendor** is in the business of sourcing consumers (each, a "Prospect") who have confirmed an interest in purchasing the Business through [VSC marketer] and/or

its affiliate or customer.

53.     In another example, between January 2018 and May 2020, a California VSC marketer that solicited Ohio residents made payments to Virtual US, Tech Direct, and Connective MGMT totaling over $3.1 million. In November 2018, Straw Director Gonzalez, as Vice President and General Manager, signed a contract on behalf of Virtual Hungary, to sell "billable leads" to the California VSC marketer. The contract language is nearly identical to other Vendor Services Agreements used by other Corporate Defendants.

54.     The contract as described in the above paragraph, as between the California VSC marketer and Virtual Hungary, was terminated by the California VSC marketer "as it was concerned regarding potentially problematic calls that Virtual Telecom may have placed."

55.     Call Originator Defendants, by transferring leads to many different independent sellers, make it difficult to impossible for consumers to know which company initiated or made the robocall.

### Abusive Telemarketing Practices

### Spoofing – Failing to Transmit Accurate Caller ID

56.     Call Originator Defendants masked the origin of their VSC robocalls, by failing to disclose the identity of the telemarketer(s) or seller(s) on whose behalf the call was made and by transmitting inaccurate caller ID information, or causing inaccurate caller ID information to be transmitted (known as "spoofing").

57.     For example, from July 2018 through December 2019, Virtual Hungary initiated over 1.7 billion outbound calls to 470 million unique telephone numbers. The spoofing pattern was evident as Virtual Hungary transmitted over 510 million unique numbers for caller ID purposes. At least 64 million of the spoofed calls were directed to telephone numbers with Ohio area codes.

17

58.     Virtual Hungary made calls, in some instances more than once, that spoofed, among other numbers, phone numbers currently assigned to the U.S. District Court for the Southern District of Ohio's office and staff.

59.     In December 2019, Congress enacted the Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act (hereinafter "the TRACED Act") to combat the scourge of unlawful robocalls.  *See* Pub. L. No. 116-105, § 13(d), 133 Stat. 3274 (2019).  Following its enactment, the FCC designated the Industry Traceback Group ("ITG") as the official traceback consortium charged with leading the telecommunications industry's efforts to trace the origin of suspected illegal robocalls through various telecommunications networks through tracebacks.

60.     A traceback identifies each of the providers through which the call passed when it traveled from the originating service provider (caller's provider) to the terminating provider (call recipient's provider).

61.     To increase the number of phone numbers available to use for caller ID, VoIP Provider Defendants purchased or leased massive quantities of unique telephone numbers.  This allowed Call Originator Defendants to use millions of numbers on a short-term basis to initiate calls that show up on the recipient's caller ID but could be non-working numbers for incoming calls.  This strategy of spreading robocalls across many different originating numbers is known as "snowshoeing," which allows illegal robocallers to hinder call blocking and call labeling analytics, as well as evade the ITG traceback process.

62.     Through simultaneous contracts with multiple VoIP service providers, Call Originator Defendants were able to purchase or lease the assignment of over 2 million unique phone numbers in just over one year to "refresh" their inventory of caller ID numbers, any of which could be used to call Ohio.

63.     Call Originator Defendants also engaged in "neighbor spoofing," which is the use of caller ID numbers with the same area code and the same or similar three-digit exchange of the call recipient to increase the odds of the call recipient answering the call.

64.     From October 2019 through March 2022, the ITG identified Call Originator Defendants in tracebacks for at least 314 campaigns pertaining to VSC offers.  The ITG defines a robocall "campaign" as a group of calls with identical or nearly identical messaging as determined by the content and calling patterns of the caller.  *A single campaign often represents hundreds of thousands or millions of calls.*[6]

### *Unlawful Robocalls*

65.     During the relevant time frame, Defendants initiated, or caused to be initiated, calls to consumers in Ohio that delivered prerecorded messages that advertised "car warranties" and other products or services without first having obtained prior express written agreements from the call recipients to receive prerecorded calls by or on behalf of any Defendants.

66.     Call Originator Defendants initiated outbound telephone calls to both cellular and residential Ohio telephone numbers that delivered prerecorded messages to induce the sale of goods or services when the persons to whom these telephone calls were made had not expressly agreed, in writing, to authorize the seller to place prerecorded calls to such persons.

67.     Defendants engaged in abusive telemarketing practices by initiating, or causing to be initiated, robocalls to Ohio numbers without first obtaining valid, prior express written consent from call recipients and by calling telephone numbers listed on the DNC Registry.

68.     At times Call Originator Defendants claimed to have "consent" received through alleged

---

[6] INDUSTRY TRACEBACK GROUP, POLICIES AND PROCEDURES, REVISED APRIL, 2022 (2022), https://tracebacks.org/wp-content/uploads/2022/04/ITG-Policies-and-Procedures-Updated-Apr-2022.pdf (last visited, July 5, 2022).

"opt in" websites to place robocalls to consumers, including to numbers on the DNC registry. Many of these websites were entirely unrelated to the automotive industry, often did not contain any VSC or auto warranty language, and purportedly would simultaneously give consent to many entities.

69.     For example, when a VoIP Provider of Sumco Panama had to respond to an ITG traceback request, Sumco Panama needed to "buy some time" before responding in order to *add* "auto services" language to the list of opt-in websites in the terms and conditions *after* many VSC robocalls were made based on the alleged "opt in" from these websites.

70.     For example, websites from which Call Originator Defendants claimed to have received consent to telemarket VSCs including, but not limited to:

> http://www.pharmnet.com
> http://www.lowestmed.com
> http://www.goodrx.com
> http://www.internationaldrugmart.com/
> https://mortgageadvisor.com/
> https://smartfinancial.com/health-insurance
> https://www.usarewardspot.com/ThankYou.aspx?source=P"
> https://www.thelawyerdirectory.com/tax-law/
> https://www.digitalmarketmedia.com/publishersform/
> https://bloodsugarpresentation.com/
> https://tax-debt.net/
> https://go.lifestreamlab.com/mobile/v2.0/
> https://rent2ownhelper.com/
> https://homesolarus.com/demo/?tabname=demo
> https://extraessay.com/
> https://www.loansonline.com/
> https://www.oneparkfinancial.com/lp/business-loans-today
> https://www.elocal.com/affiliate-contact
> https://www.247autowarranty.com

71.     A number of Ohio residents who received robocalls by or on behalf of Defendants specifically refute opting in or giving consent to receive any prerecorded message calls about auto warranties to their cellular or residential numbers.

72.     For example, on or about July 31, 2020, Ohio resident J.S. received a VSC robocall on his cellular number which had been listed on the DNC Registry for several years. Shortly thereafter, J.S. filed a consumer complaint with the Ohio Attorney General's Consumer Protection Section and provided a signed declaration indicating that he did not give consent to Defendants to call him using prerecorded messages.

73.     For example, on or about June 1, 2020, Ohio resident D.W. began receiving VSC robocalls from Defendants. Shortly thereafter, D.W. filed a consumer complaint with the Ohio Attorney General's Consumer Protection Section and provided a signed declaration. In the declaration, D.W. indicated that she did not give consent to Defendants to call her cellular or landline telephone numbers using prerecorded messages.

74.     For example, on or about July 17, 2020, Ohio resident L.H. received a VSC robocall from Defendants. Shortly thereafter, L.H. filed a consumer complaint with the Ohio Attorney General's Consumer Protection Section and provided a signed declaration. In the declaration, L. H. indicated that she did not give consent to Defendants to call her cellular telephone number to deliver prerecorded messages. Further, her telephone number had been listed on the DNC Registry for several years.

75.     At times material to this Complaint, over 1,600 unwanted call complaints filed with the Ohio Attorney General's Consumer Protection Section were determined to have originated with Call Originator Defendants.

76.     Call Originator Defendants' robocalls have been the subject of thousands of consumer complaints filed with the FTC's Consumer Sentinel Do Not Call database, a national clearinghouse, where the calls described in the complaints were determined to be originated by

21

Call Originator Defendants. Over 3,100 of those complaints filed with the FTC were associated with Ohio telephone numbers where the complainant confirms they were Ohio residents.

### *Do Not Call Registry Violations*

77. Between July 2018 and June 2021, Defendants initiated or caused to be initiated at least 250 million outbound telephone calls to telephone numbers with Ohio area codes on the DNC Registry.

### *Seller-Specific Do Not Call Registry Violations*

78. At times material to this Complaint, Call Originator Defendants initiated outbound calls to persons who had previously requested to opt-out from future calls from Defendants. Numerous consumers reported receiving additional calls despite following the prompt in the previous call's prerecorded message to press two "to be removed and put on our do not call list."

79. After receiving at least eight VSC robocalls from Call Originator Defendants to his cellular number listed on the DNC Registry, Ohio resident T.D. filed a consumer complaint with the FTC on September 8, 2020, stating:

> Auto Warranty Scam. I've repeatedly elected the DO NOT CALL option, but they keep calling from new number each time. The number is legitimate - if you call it back, you get their recording. Please make it stop. It's several times per day.

Between March 20, 2020 and February 19, 2021, Defendants placed at least 31 calls to T.D.

80. After receiving at least seven robocalls from Call Originator Defendants to her cellular number listed on the DNC Registry, Ohio resident A.H. filed a consumer complaint with the FTC on August 13, 2020 stating:

> In order to request they stop calling me, I had to dial the number that called me and deal with an automated system and press a number. They have been calling me from VoIP numbers while I'm at work, while I'm at church, while on calls with other people, never leaving voicemails and when I do chance answer, have been rude and yell at me or deal with an automated message if they do choose to leave a

voicemail. I signed up for the do not call registry for a reason, so these harassing
calls would stop, and they did for a bit, but are now increasing again.

A.H. filed a second complaint on August 31, 2020, stating:

Second time I had to do a call back to request my number be removed from their
list. I have no warranties on any of my vehicles, never have I had any warranties on
my vehicles. They have been calling me while at work mostly, never leave
voicemails, always using VoIPs which I block from my phone and they call from
another VoIP number. These calls NEED TO STOP, I'm beyond annoyed with
them and these are clearly scam calls.

Between August 31, 2020 and February 24, 2021, A.H. received at least 17 additional calls from

Call Originator Defendants.

### *Robocalls Without Required Disclosures*

81.     At times material to this Complaint, Defendants initiated or caused to be initiated many

telephone calls to Ohio numbers that delivered prerecorded messages that failed to disclose the

identity of the telemarketer or seller on whose behalf the call was made.

82.     In numerous instances, Defendants initiated or caused to be initiated many telephone calls

to Ohio numbers that delivered prerecorded messages, which included advertisements, but failed

to provide the name of the seller or telemarketer that was registered with the state's secretary of

state offices or comparable agency.

## COMMON ENTERPRISE
## AND INTERCHANGEABLE IDENTITIES

83.     At various times material to the Complaint, Call Originator Defendants and Financial Shell

Defendants have operated as a common enterprise while engaging in the acts and practices alleged

in this Complaint.  Defendants have conducted these acts and practices through a maze of

interrelated corporations and limited liability companies that have strongly interdependent

economic interests, operate under common control, with common actual or *de facto* officers and/or

members, with common business functions, and share business resources typically shared in an

office, such as common Internet Protocol ("IP") addresses and the use of commingled funds. Because these Defendants have operated as a common enterprise, each is jointly and severally liable for the acts and practices alleged below.

84.    At various times material to the Complaint, Individual Defendants formulated, directed, controlled, had the authority to control, or participated in the acts and practices, directly or indirectly, of one or more Call Originator Defendants and Financial Shell Defendants that constitute the common enterprise. The Individual Defendants each had knowledge of the unlawful acts and practices used in furtherance of the common enterprise.

### Call Originator Defendants' and Financial Shell Defendants'
### Participation in the Common Enterprise

85.    Call Originator Defendants contract with VSC marketers to generate leads through robocalls. Call Originator Defendants often also act as VoIP Providers to mask the origin of the calls in traceback requests, acting in two capacities for the common enterprise. Additionally, some Financial Shell Defendants contract with VSC marketers, as well as receive and make payments on behalf of Call Originator Defendants.

86.    Corporate Defendants often use their business names interchangeably such that they lack separate identities. A number of their accounts set up to obtain VoIP services have more than one of the Corporate Defendant business names associated with the accounts. There are numerous instances where Call Originator Defendants and Financial Shell Defendants contract with service providers using multiple business names or contract as Call Originator Defendant, but the payment comes from a Financial Shell Defendant.

87.    For example, the email addresses used for a Paypal account opened by Fugle in August 2020 illustrate the interchangeable nature of Corporate Defendants' business names and the

24

intention to comingle funds for Fugle, Geist, and Mobi in the account. Fugle provided three email addresses for its Paypal account, including:

    a.    fugletelecom@protonmail.com;
    b.    info@geisttelecom.net; and
    c.    mobitelecom@protonmail.com.

88.    Defendants utilize common resources, much like a company that shares an office. For example, Call Originator Defendants used common IP addresses, which is analogous to using the same phone in an office space or utilizing a common computer in an office to send business emails.

89.    Call Originator Defendants obtained VoIP service to initiate calls from at least six different VoIP providers and utilized common IP addresses or IP addresses with ties to the same account for call signaling. The IP address is the signal, or designated place, from which calls are sent, and may also be the signal at which they are received, which acts, in a way, like a telephone number or shared computer.

90.    Call Originator Defendants communicated using shared Skype Live IDs with various business vendors, including several VoIP service providers.

91.    Call Originator and Financial Shell Defendants share the common business purpose of furthering the lead generation scheme through robocalls and forwarding live transfer calls to waiting call centers for VSC marketers.

92.    Despite VoIP Provider Defendants having registered with the FCC as Interconnected VoIP service providers, in addition to selling of VoIP minutes, the primary business function was to sell lead services generated through robocalls and other telemarketing.

93.    Call Originator Defendants and Financial Shell Defendants have some common business functions as they both contract with VSC marketers and/or VoIP providers in furtherance of the robocall operation.

94.    Financial Shell Defendants obtained bank accounts that received money from clients, paid for necessary services, and paid proceeds to the Individual Defendants.

95.    Defendants have commingled funds.  Examples of the commingling of funds are described in Paragraphs 99(e),(f); 100(b),(c),(h),(i); 101(e),(f),(g); 103(c); and 105(a).

96.    Call Originator and Financial Shell Defendants have common actual or *de facto* corporate officers, members, or directors as described in Paragraphs 25-32.

97.    Call Originator and Financial Shell Defendants share common beneficial or *de facto* ownership and control by Individual Defendants Yim, Jones, and Cox.

### *Individual Defendants' Participation in the Common Enterprise*

98.    Individual Defendants participated in the common enterprise and directly or indirectly benefited from it through financial gain.   Additionally, Individual Defendants are owners, directors, or signatories of bank accounts for the common enterprise corporations and LLCs.

99.    Cox's involvement with and acts in furtherance of the common enterprise include:

    a.    Cox and Jones (through Yim), received the majority of the proceeds of the common enterprise.

    b.    The great majority of the funds flowing from Call Originator Defendants went to Cox and Yim through Financial Shell Defendants.

    c.    Cox was a signatory on bank accounts for Davis US and Virtual US.

    d.    Cox paid for a cloud server account through his personal PayPal account and IP addresses connected to the cloud server account were used by several of the Call Originator Defendants to initiate robocalls via five different VoIP service accounts.

    e.    From January 2018 through October 2020, Technologic USA, Virtual US, and

26

        Tech Direct made payments on Cox's behalf for his primary residence in Irvine California.

f.    At least twice Davis US made payments for an apartment Cox shares with Szuromi in Panama City, Panama.

g.    At times material to this Complaint, Cox received over $430,000 from the bank accounts of numerous Defendants, including Technologic USA, Virtual US, Tech Direct, Sumco Panama, and payments via Zelle from Jovita Luna (an alias for Cedeno).

h.    In February 2020, Cox used his personal credit card to pay for the domain registration for DavisTelecom.com.

100.   Jones's involvement with and acts in furtherance of the common enterprise include:

a.    Jones and Cox (through Yim), received the majority of the proceeds of the common enterprise.

b.    Jones's partner, Yim, received over $2 million from a single Financial Shell Defendant, Connective MGMT. The signatory on Connective MGMT's account was a nonparty, but Jones's email address associated with the account.[7] Connective MGMT paid for a portion of Jones's legal expenses in a civil case he brought against two co-defendants from a prior FTC civil action.

c.    Connective MGMT closed the account after significant funds were wired into an account under the name of Tech Direct.

d.    Jones received funds for his benefit indirectly from Call Originator Defendants'

---

[7] The nonparty signatory on the Connective MGMT account is Andrew Yoshioka, a known associate of Jones and one of Jones's co-defendants in *FTC v. Aaron Michael Jones*, No. 8:17-cv-00058 (C.D. Cal).

and Financial Shell Defendants' accounts.

e.    In late 2019, Jones contacted a provider of artificial intelligence (AI) bots to design, for his business, a voice-prompted, conversational bot platform to use with telephone service to respond to customer service calls. He requested that the bot be designed to prescreen callers regarding their interest in a vehicle warranty (despite actually marketing a VSC) using the following script, and then transfer interested callers on to a live operator:

> Hi, this is Diana calling from Vehicle Service Department.
> We're doing your scheduled warranty checkup.
> Our system indicates you have yet to extend factory warranty.
> Have you received any of the final notifications sent out to you?
> Could you please verify the year, make and model of your vehicle so I can look up your file?
> Okay, approximately how many miles are on your vehicle?
> Okay, now I'm going to bring a license representative online to go over all the information with you.

Interested callers were then transferred on to live calls.

f.    Jones gave the specifications, which matched the prescreening requirements of the VSC marketer contracts, that the bot provider used to develop the bot. The bot was set to receive inbound calls from two IP addresses and, after interacting with the virtual bot, potentially interested consumers were routed/transferred to another IP address Jones provided.

g.    Some of the common IP addresses used by Call Originator Defendants overlap with two IP addresses Jones gave to the bot provider or otherwise tie to a shared internet service account.

h.    In early 2020, the bot provider sent invoices to Jones related to the voice-prompted

bot.  The invoices were paid by Tech Direct.

    i.    Following a payment by Posting Express, Jones received 300,000 shares of the bot provider's preferred stock, which gave Jones a 3% ownership in the bot provider.

101.    Yim's involvement with and acts in furtherance of the common enterprise include:

    a.    Yim's personal participation in the robocall operation is primarily tied to the transfer of funds throughout the common enterprise.

    b.    The great majority of the funds flowing from Call Originator Defendants went to Yim and Cox through Financial Shell Defendants.

    c.    Yim received proceeds from Tech Direct, Virtual US, and Sumco Panama.

    d.    Yim is an officer for Posting Express and is the sole signatory on the bank accounts for Posting Express.

    e.    Yim's Posting Express account paid money to the bot provider, in exchange for Jones receiving preferred stock in the bot provider.

    f.    Yim's Posting Express account paid for a portion of legal expenses for Defendant Jones in a civil case against two of his co-defendants in an FTC civil action.

    g.    Yim's Posting Express paid for Yim's personal expenses, such as her American Express credit card bill, daily expenses, Yim's car payments through Mercedes Benz Financial Services, and a cruise vacation.

    h.    In 2021, Posting Express paid $232,000 in "capital contributions" to a Florida VSC marketer, and received $385,000 labeled as "distribution payments" from the same seller.  Yim earned commission from sales that resulted from leads provided to this Florida VSC marketer.

     i.     Yim also has an ownership interest in this Florida VSC marketer for which the robocall operation is generating leads.

     j.     Yim benefited financially from the robocall scheme individually, and also used the scheme to generate sales leads for contracts being sold by the Florida VSC marketer in which she has an ownership interest.

102.    Cedeno's involvement with and acts in furtherance of the common enterprise include:

     a.     Cedeno is listed as (and has acted as) the Director/President of Sumco Panama on the company's publicly available registration documents for the government of Panama.

     b.     Cedeno created a cloud server account for Sumco Panama and Call Originator Defendants used the IP addresses associated with Cedeno's cloud server account to initiate VSC robocalls.

     c.     Cedeno directly received proceeds from the common enterprise's operation from Davis US, Tech Direct, Virtual US, and Cox.

103.    Szuromi's involvement with and acts in furtherance of the common enterprise include:

     a.     Szuromi is listed as the Director/Secretary of Sumco Panama on the company's publicly available registration documents for the government of Panama.

     b.     Szuromi is an officer and director of Sumco Panama, Sumco USA, Davis US, Davis Panama, and is the signatory on a bank account for Davis US, which paid for services used in the initiation of illegal robocalls.

     c.     From January 2018 through October 2020, Davis US made payments for an apartment Cox shared with Szuromi in Panama City, Panama at least twice.

104.    Bridge's involvement with and acts in furtherance of the common enterprise include:

a.  Bridge opened financial accounts for Virtual US, Davis US, and Technologic USA, which Defendants used in the illegal robocall operation.

b.  Bridge signed contracts in furtherance of the scheme.

c.  Bridge opened an account with Wells Fargo bank for Davis US in which she identified herself as an "owner with control of the entity." This account was used in furtherance of the illegal robocall operation.

d.  In another telemarketing fraud case filed jointly by the FTC and the State of Ohio, Bridge, through counsel, responded to a Civil Rule 45 subpoena as President of Technologic USA.

e.  Bridge received thousands of dollars from Tech Direct, Davis US, and Cox.

f.  The Florida VSC marketer mentioned in Paragraph 101(h)-(j) also paid $5,000 to Davis US.

105.  Batista's involvement with and acts in furtherance of the common enterprise include:

a.  Batista opened a Chase bank account for Tech Direct. This account received funds from Technologic USA in March 2019 and then immediately sent the funds to Virtual US. Batista then closed the account and received a cashier's check written in her name.

b.  In the same time frame, Batista opened a Wells Fargo bank account for Tech Direct, and the industry listed on the application was Real Estate. Batista, a licensed real estate broker, was listed as the owner of the account with control of the entity. Batista indicated the account was open for the purpose of residential real estate rentals, however this account received money transfers from Connective MGMT.

31

    c.    Batista opened a PayPal account for Tech Direct.

    d.    Batista received payments for her participation in the common enterprise from Cox, Tech Direct, Technologic USA, and Virtual US.

106.    Horvath's involvement with and acts in furtherance of the common enterprise include:

    a.    Horvath is the Chief Executive Officer on the FCC's VoIP Provider record for Virtual Hungary and is the Secretary and Treasurer for Virtual US.

    b.    In an email sent on behalf of Virtual Hungary to other entities, Horvath provided payment information for Tech Direct as an acceptable account for outside entities to make payments to Virtual Hungary.

    c.    Horvath received payments from Davis US, Tech Direct, Technologic USA, and Virtual US.

107.    Individual Defendants, using Straw Directors, obscured the relationship between the Defendants in the robocall scheme in furtherance of the common enterprise.

***Straw Directors' Roles in the Common Enterprise***

108.    The Straw Directors described in Paragraph 41 appeared to serve as officers or members of Corporate Defendants. The use of Straw Directors further illustrates the links between Defendants in the complex robocall lead generation scheme.

109.    Straw Director Hardon's role in the common enterprise include:

    a.    Hardon is listed as the Chief Executive Officer on Technologic's FCC VoIP filing and signed contracts with two VoIP service providers, among others, for Technologic as its VP General Manger.

    b.    Hardon signed a contract with a VSC marketer, as well as other contracts, on behalf of Davis Panama.

110. Straw Director Gonzalez's role in the common enterprise include:

    a.    Gonzalez has been identified as the president of Technologic and as Chief Executive Officer of Davis Panama on each companies' VoIP provider FCC filings.

    b.    Gonzalez signed multiple contracts to provide leads for VSC marketers both on behalf of Virtual US as the "Gen Man & Vice Pres" and Tech Direct.

    c.    Gonzalez signed contracts to obtain VoIP services on behalf of Virtual Hungary.

    d.    Gonzalez signed an FCC form with a VoIP service provider on behalf of Davis US as Vice President and General Manager.

    e.    Showing the interconnectedness of Gonzalez's roles with Defendants, she used the email support@virtualtelecom.hu when signing the contract on behalf of Tech Direct. Additionally, a Sumco Panama email address was used in sending a contract signed by Gonzalez between Virtual Telecom and a VoIP service provider.

111. Straw Director Singh's role in the common enterprise include:

    a.    Singh is listed as Chief Executive Officer of Mobi on FCC VoIP Provider records.

    b.    Singh signed contracts with VoIP service providers, as well as other documents on behalf of Mobi, representing he was President of Mobi.

112. Straw Director Radimiri's role in the common enterprise include:

    a.    Radimiri is listed as Chief Executive Officer of Geist on an FCC VoIP Provider record and signed multiple contracts on behalf of Geist.

## PIERCING THE CORPORATE VEIL

113.   Defendants operate with coordinated efforts designed to create layers of protection to the beneficiaries of the scheme.  Cox and Jones have historically moved on from litigation against their robocall operating companies or financial shell companies by shutting them down and opening different companies to engage in new, but often strikingly similar, schemes.  In this instance, Individual Defendants have knowingly directed and controlled this fraudulent scheme. Along with all Individual Defendants, the repeat offenders Jones and Cox are engaged in these very tactics to protect their ill-gotten gains.  Individual Defendants, and any other individual who received a monetary payment or benefit structured to evade civil liability, should not be able to hide behind the corporate veil.  The Defendants showed no respect for corporate formalities.  The corporations and LLCs were created and operated with fraudulent intent, and to allow Defendants to evade liability would allow an injustice to occur.

### *Corporations Showed No Respect for Corporate Formalities*

114.   Defendants demonstrated a complete lack of respect as to the separate identities of each of the business entities and failed to adhere to minimal standard business formalities such as complying with corporate laws or regulations to maintain business registrations with their respective state's Secretary of State offices and the FCC with respect to their telecommunications provider registrations.

115.   In particular, some Financial Shell Defendants are listed as inactive by the relevant Secretary of State for failing to maintain registration requirements.

116.   VoIP Provider Defendants were each registered as VoIP providers, but failed to maintain practices that would be typical of telecommunications service providers.  For example, no VoIP Provider Defendants have public facing, operational websites where their services are offered.

117.    The TRACED Act made it mandatory for voice service providers[8] to file robocall mitigation plans with the FCC by June 30, 2021.  Additionally, pursuant to the TRACED Act, all service providers are required to respond to traceback requests from the FCC, civil or criminal law enforcement, or the consortium.[9]

118.    In May 2021, Mobi filed a Robocall Mitigation Plan with the FCC, as required by the FCC.  However, Virtual Hungary, Technologic, Davis Panama, Geist and Fugle have failed to make filings.

119.    VoIP Provider Defendants have failed to respond to at least some ITG traceback requests.

120.    As described in Paragraph 95, Defendants comingled the funds of the Corporate Entities, and, at times, used personal accounts to pay for business expenses and used corporate accounts to pay for personal expenses.

121.    As described in Paragraphs 83-112, Defendants treated the corporate identities as interchangeable, showing no respect for the corporate formalities.

122.    Jones, Yim, and Cox, through their combined knowledge, experience, and contributions to the common enterprise, have operated in such a way that separate personalities of the corporations and owners do not truly exist.  They are vital to the current operation, and the proceeds received by them indicate they are the beneficial owners of Financial Shell and Call Originator Defendants as described in Paragraphs 99-101.

### *Fraudulent Intent*

123.    Jones and Cox, because of their previous civil actions for strikingly similar illegal robocall operations, have demonstrated they have knowledge of their wrongdoings and have further

---

[8] *See* TRACED Act § 4(b)(5)(C) (This requirement applies to voice service providers that originate and terminate call traffic that did not receive an extension or do not utilize Stir/Shaken).
[9] *See* 47 C.F.R. § 64.1200(n) (2022).

demonstrated through previous litigation that they are willing and able to dissolve one business and form another.

124.     To evade civil liability to potential plaintiffs, Jones and Cox set up an elaborate scheme through the common enterprise and used all other named Defendants to shield themselves from liability.

125.     As opposed to money going directly to Jones or Cox, on information and belief, Jones's domestic partner, Yim, receives proceeds from the complex scheme and shares those proceeds with Jones and Cox.

126.     Corporations were fraudulently formed to shield Jones and Cox from liability.  Upon formation, the corporations did not follow corporate formalities such as paying taxes, issuing stock, holding annual meetings, or acting as a VoIP Provider without following the required formalities.

### *Injustice if Defendants' Corporate Form is Respected*

127.     Individual Defendants have each directly or indirectly participated, controlled, or were in positions of authority for one or more of the Corporate Defendants in the common enterprise.

128.     The corporations and LLCs formed by Defendants were created to shield Jones, Cox, and Yim from liability and create a complex and layered scheme.

129.     Allowing Individual Defendants to use a corporate veil to escape liability for their roles in a deceptive scheme that subjected Ohioans to hundreds of millions of illegal robocalls would sanction fraud and injustice.  Individual Defendants should not be protected by hiding behind their numerous corporations or limited liability companies, including those outside of the country.

## THE TELEPHONE CONSUMER PROTECTION ACT

130.    The TCPA, enacted in 1991, amended the Communications Act of 1934 by adding 47

U.S.C. § 227, which required the Federal Communications Commission ("FCC") to

> initiate a rulemaking proceeding concerning the need to protect residential
> telephone subscribers' privacy rights to avoid receiving telephone solicitations to
> which they object... The regulations required by [the TCPA] may require the
> establishment and operation of a single national database to compile a list of
> telephone numbers of residential subscribers who object to receiving telephone
> solicitations, and to make that compiled list and part thereof available for purchase.
> If the Commission determines to require such a database, such regulations shall- ...
> (F) prohibit any person from making or transmitting a telephone solicitation to the
> telephone number of any subscriber included in such database...

47 U.S.C. § 227(c)(l) and (c)(3).

131.    In 1992, the FCC promulgated rules pursuant to the TCPA.

132.    On June 26, 2003, the FCC revised its rules and promulgated new rules pursuant to the

TCPA.  Similar to the FTC's TSR, the TCPA also prohibits calls to numbers listed on the DNC

Registry.

133.    A relevant FCC Do-Not-Call Rule, 47 C.F.R. § 64.1200(c), provides in part: "(c) No person

or entity shall initiate any telephone solicitation [as defined in paragraph (f)(15) of this section] to

... (2) A residential telephone subscriber who has registered his or her telephone number on the

national do-not-call registry of persons who do not wish to receive telephone solicitations that is

maintained by the Federal Government."

134.    The TCPA itself and another relevant FCC Rule, 47 U.S.C. § 227(a)(4) and 47 C.F.R. §

64.1200(f)(15), respectively, provide in part: "The term telephone solicitation means the initiation

of a telephone call or message for the purpose of encouraging the purchase or rental of, or

investment in, property, goods, or services, which is transmitted to any person . . . ."

135.    The TCPA itself and another relevant FCC Rule, 47 U.S.C. § 227(b)(l)(B) and 47 C.F.R.§

37

64.1200(a)(3), respectively, provide that it is unlawful for a person to: "Initiate any telephone call to any residential line using an artificial or prerecorded voice to deliver a message without the prior express written consent of the called party unless the call . . . is exempted by rule or order . . . ."

136.    The TCPA, 47 U.S.C. § 227(b)(1)(A)(iii), makes it unlawful for any person to: "make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using . . . an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service . . . ." Relevant FCC Rule 47 C.F.R. § 64.1200(a)(1)(iii) similarly prohibits persons or entities from initiating calls to a cellular telephone using an artificial or prerecorded voice without the prior express consent of the called party.  Relevant FCC Rule C.F.R. § 64.1200(a)(2) further prohibits persons from initiating or causing to be initiated calls that include or introduce an advertisement or constitute telemarketing to cellular telephones using an artificial or prerecorded voice without the prior express written consent of the called party.

137.    The TCPA, 47 U.S.C. § 227(d)(3)(A) and FCC Rule, 47 C.F.R. § 64.1200(b)(1), provide in part that "all artificial or prerecorded voice telephone messages shall . . . at the beginning of the message, state clearly, the identity of the business, individual, or other entity that is responsible for initiating the call.  If a business is responsible for initiating the call, the name under which the entity is registered to conduct business with the State Corporation Commission (or comparable regulatory authority) must be stated.

138.    The TCPA further provides in part:

> Whenever the attorney general of a State, or an official or agency designated by a State, has reason to believe that any person has engaged or is engaging in a pattern or practice of telephone calls or other transmissions to residents of that State in violation of this section or the regulations prescribed under this section, the State may bring a civil action on behalf of its residents to enjoin such calls, an action to

recover for actual monetary loss or receive $500 in damages for each violation, or both such actions. If the court finds the defendant willfully or knowingly violated such regulations, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the amount available under the preceding sentence.

47 U.S.C. § 227(g)(1).

139.    This Court, in the exercise of its equitable jurisdiction, may award other ancillary relief to remedy injuries caused by Defendants' violations of the TCPA.

### THE TELEMARKETING SALES RULE

140.    The Telemarketing Act was enacted in 1994, and as part of the enactment, Congress found that "[c]onsumers and others are estimated to lose $40 billion a year in telemarketing fraud," and "[c]onsumers are victimized by other forms of telemarketing deception and abuse." 15 U.S.C. § 6101(3) and (4).

141.    Congress directed the FTC to prescribe rules prohibiting abusive and deceptive telemarketing acts or practices pursuant to the Telemarketing Act, 15 U.S.C. §§ 6101-6108. The FTC adopted the original TSR in 1995, extensively amended it in 2003, and amended certain provisions thereafter. 16 C.F.R. Part 310.

142.    For purposes of the TSR, a "seller" is any person who, in connection with a telemarketing transaction, provides, offers to provide, or arranges for others to provide goods or services to a customer in exchange for consideration. 16 C.F.R. § 310.2(dd).

143.    For purposes of the TSR, a "telemarketer" means any person who, in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor. 16 C.F.R. § 310.2(ff).

144.    For purposes of the TSR, "telemarketing" means a plan, program, or campaign which is conducted to induce the purchase of goods or services or a charitable contribution, by use of one

or more telephones and which involves more than one interstate telephone call.  16 C.F.R. §
310.2(gg).

145.    Defendants are all "sellers" or "telemarketers" engaged in "telemarketing" as defined by
the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).

146.    The TSR provides that it is a deceptive telemarketing act or practice for any seller or
telemarketer to engage in "[m]isrepresenting, directly or by implication, in the sale of goods or
services any of the following material information:" "[a]ny material aspect of the performance,
efficacy, nature, or central characteristics of goods or services that are the subject of a sales offer."
16 C.F.R. § 310.3(a)(2)(iii).

147.    The TSR provides that it is a deceptive telemarketing act or practice for any seller or
telemarketer to engage in "[m]aking a false or misleading statement to induce any person to pay
for goods or services…" 16 C.F.R. § 310.3(a)(4).

148.    The 2003 amendments to the TSR established the DNC Registry, maintained by the FTC,
of consumers who do not wish to receive certain types of telemarketing calls.  Consumers can
register their telephone numbers on the DNC Registry without charge either through a toll-free
telephone call or over the Internet at www.donotcall.gov.

149.    The TSR prohibits sellers and telemarketers from initiating an outbound telephone call to
telephone numbers on the DNC Registry.  16 C.F.R. § 310.4(b)(1)(iii)(B).  Under the TSR, an
"outbound telephone call" means a telephone call initiated by a telemarketer to induce the purchase
of goods or services or to solicit a charitable contribution. 16 C.F.R. § 310.2(x).

150.    The FTC allows sellers, telemarketers, and other permitted organizations to access the
DNC Registry and to download the numbers not to call.

151.    The TSR prohibits sellers and telemarketers from initiating an outbound telephone call to

any consumer when that consumer previously has stated that he or she does not wish to receive an outbound telephone call made by or on behalf of the seller whose goods or services are being offered. 16 C.F.R. § 310.4(b)(1)(iii)(A). The TSR makes it an abusive telemarketing act or practice to "fail to honor" a call recipient's request to be placed on a do not call list. 16 C.F.R. § 310.4(b)(1)(ii).

152. As amended, effective September 1, 2009, the TSR prohibits initiating an outbound telephone call that delivers a prerecorded message to induce the purchase of any good or service unless the seller has obtained from the recipient of the call an express agreement, in writing, that evidences the willingness of the call recipient to receive calls that deliver prerecorded messages by or on behalf of a specific seller. 16 C.F.R. § 310.4(b)(1)(v). The "express agreement" must include the recipient's telephone number and signature, must be obtained after a clear and conspicuous disclosure that the purpose of the agreement is to authorize the seller to place prerecorded calls to such person, and must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service. *Id.*

153. The TSR requires telemarketers in an outbound telephone call to induce the purchase of services to disclose the identity of the seller truthfully, promptly, and in a clear and conspicuous manner to the person receiving the call. 16 C.F.R. § 310.4(d)(1).

154. The TSR requires that sellers and telemarketers transmit or cause to be transmitted the telephone number of the telemarketer and, when made available by the telemarketer's carrier, the name of the telemarketer ("caller ID information"), to any caller identification service in use by a recipient of a telemarketing call, or transmit the customer service number of the seller on whose behalf the call is made and, when made available by the telemarketer's carrier, the name of the seller. 16 C.F.R. § 310.4(a)(8).

41

155.    Pursuant to 15 U.S.C. § 6103(a), the attorney general of any state has the authority to enforce the TSR.  The Telemarketing Act further provides, in part:

> Whenever an attorney general of any State has reason to believe that the interests of the residents of that State have been or are being threatened or adversely affected because any person has engaged or is engaging in a pattern or practice of telemarketing which violates any rule of the Commission under section 6102 of this title, the State, as parens patriae, may bring a civil action on behalf of its residents in an appropriate district court of the United States to enjoin such telemarketing, to enforce compliance with such rule of the Commission, to obtain damages, restitution, or other compensation on behalf of residents of such State, or to obtain such further and other relief as the court may deem appropriate.

15 U.S.C. § 6103(a).

156.    This Court, in the exercise of its equitable jurisdiction, may award other ancillary relief to remedy injuries caused by some of the Defendants' violations of the TSR.

## VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT
### COUNT I
### Unlawful Robocalls to Cellular Numbers

157.    In numerous instances, Call Originator Defendants violated 47 U.S.C. § 227(b)(1)(A)(iii) and 47 C.F.R. §§ 64.1200(a)(1)(iii) or 64.1200(a)(2) by initiating calls or causing calls to be initiated to cellular telephone lines using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party and where the call was not initiated for emergency purposes or exempted by rule or order of the Federal Communications Commission under 47 U.S.C. § 227(b)(2)(C).

158.    Individual Defendants, at all times pertinent hereto, directly or indirectly, controlled and directed the business activities and sales conduct of at least one of the Call Originator Defendants, causing, personally participating in, benefiting from, or ratifying the acts and practices of at least one of the Call Originator Defendants, including the conduct giving rise to the violations described herein, and are therefore liable for said violation of the TCPA.

42

159.     Individual Defendants, at all times pertinent hereto, through their acts and practices, showed no respect for the corporate form in creating, controlling, and directing the business activities and sales conduct of at least one of the Call Originator Defendants, performed these acts or practices with fraudulent intent, and are therefore liable for said violation of the TCPA.

160.     Defendants' violations are willful and knowing.

## COUNT II
### Unlawful Robocalls to Residential Numbers

161.     In numerous instances, Call Originator Defendants violated 47 U.S.C. § 227(b)(1)(B) and 47 C.F.R. § 64.1200(a)(3), by initiating calls to residential telephone lines using artificial or prerecorded voices to deliver a message without the prior express written consent of the called party and where the call was not initiated for emergency purposes or exempted by rule or order of the Federal Communications Commission under 47 U.S.C. § 227(b)(2)(B).

162.     Individual Defendants, at all times pertinent hereto, directly or indirectly, controlled and directed the business activities and sales conduct of at least one of the Call Originator Defendants, causing, personally participating in, benefiting from, or ratifying the acts and practices of at least one of the Call Originator Defendants, including the conduct giving rise to the violations described herein, and are therefore liable for said violation of the TCPA.

163.     Individual Defendants, at all times pertinent hereto, through their acts and practices, showed no respect for the corporate form in creating, controlling, and directing the business activities and sales conduct of at least one of the Call Originator Defendants, performed these acts or practices with fraudulent intent, and are therefore liable for said violation of the TCPA.

164.     Defendants' violations are willful and knowing.

## COUNT III
### Calls to Numbers on the National DNC Registry

165.    In numerous instances, Call Originator Defendants violated 47 U.S.C. § 227(c) and 47

C.F.R. § 64.1200(c)(2) by initiating telephone solicitations to residential telephone subscribers

whose telephone numbers were listed on the DNC Registry.

166.    Individual Defendants, at all times pertinent hereto, directly or indirectly, controlled and

directed the business activities and sales conduct of at least one of the Call Originator Defendants,

causing, personally participating in, benefiting from, or ratifying the acts and practices of at least

one of the Call Originator Defendants, including the conduct giving rise to the violations described

herein, and are therefore liable for said violation of the TCPA.

167.    Individual Defendants, at all times pertinent hereto, through their acts and practices,

showed no respect for the corporate form in creating, controlling, and directing the business

activities and sales conduct of at least one of the Call Originator Defendants, performed these acts

or practices with fraudulent intent, and are therefore liable for said violation of the TCPA.

168.    Defendants' violations are willful and knowing.

## COUNT IV
### Failure to Disclose Caller's Identity

169.    In numerous instances, Call Originator Defendants violated 47 U.S.C. § 227(d)(3)(A) and

47 C.F.R. § 64.1200(b)(1) by initiating calls to residential telephone lines using artificial or

prerecorded voices to deliver messages that failed to clearly state, at the beginning of the message,

the identity of the business, individual, or other entity responsible for initiating the call and the

name under which the business entity is registered to conduct business with the State Corporation

Commission or the comparable regulatory authority.

170.    Individual Defendants, at all times pertinent hereto, directly or indirectly, controlled and

directed the business activities and sales conduct of at least one of the Call Originator Defendants causing, personally participating in, benefiting from, or ratifying the acts and practices of at least one of the Call Originator Defendants, including the conduct giving rise to the violations described herein, and are therefore liable for said violation of the TCPA.

171. Individual Defendants, at all times pertinent hereto, through their acts and practices, showed no respect for the corporate form in creating, controlling, and directing the business activities and sales conduct of at least one of the Call Originator Defendants, performed these acts or practices with fraudulent intent, and are therefore liable for said violation of the TCPA.

172. Defendants' violations are willful and knowing.

## VIOLATIONS OF THE TELEMARKETING SALES RULE
### COUNT V
### Unlawful Robocalls

173. In numerous instances, in connection with telemarketing, Defendants, acting together through the common enterprise, initiated or caused others to initiate outbound telephone calls that delivered prerecorded messages without the express consent, in writing, of the call recipient in violation of 16 C.F.R. § 310.4(b)(1)(v).

### COUNT VI
### Misleading Representations

174. In numerous instances, in connection with telemarketing, Defendants, acting together through the common enterprise, made or caused others to make deceptive outbound telephone calls that misrepresented the nature and central characteristics of the service being offered in violation of 16 C.F.R. § 310.3(a)(2)(iii).

175. In numerous instances, in connection with telemarketing, Defendants, acting together through the common enterprise, made or caused others to make deceptive outbound telephone calls

that included false or misleading statements to induce consumers to purchase goods or services in violation of 16 C.F.R. § 310.3(a)(4).

## COUNT VII
### Failure to Honor Do Not Call Requests

176.    In numerous instances, in connection with telemarketing, Defendants, acting together through the common enterprise, initiated or caused others to initiate outbound telephone calls to persons who had previously stated that they did not wish to receive calls made by or on behalf of the seller whose goods or services were being offered in violation of 16 C.F.R. § 310.4(b)(1)(iii)(A).

## COUNT VIII
### Failure to Transmit Accurate Caller ID

177.    In numerous instances, in connection with telemarketing, Defendants, acting together through the common enterprise, failed to transmit or caused to not be transmitted an accurate telephone number, and the name of the telemarketer or seller, when made available by the call recipient's service provider, to any caller identification service in use by call recipients, in violation of 16 C.F.R. § 310.4(a)(8).

## VIOLATIONS OF OHIO LAWS
## COUNT IX
### Violations of the Ohio Consumer Sales Practices Act

178.    The Ohio CSPA, O.R.C. § 1345.02 prohibits "suppliers" from engaging in unfair or deceptive consumer sales acts or practices.

179.    Call Originator Defendants and Individual Defendants are "suppliers" as defined in O.R.C. § 1345.0l(C), since Defendants engage in the business of effecting "consumer transactions," either directly or indirectly, for purposes that are primarily personal, family, or household within the meaning as specified in O.R.C. § 1345.01(A) of the Ohio CSPA.

46

180.    Individual Defendants at all times pertinent hereto, directly or indirectly, controlled and directed the business activities and sales conduct of at least one Call Originator Defendant, causing, personally participating in, benefiting from, or ratifying the acts and practices of at least one Call Originator Defendant, including the conduct giving rise to the violations described herein.

181.    Unless issued by an insurer as authorized or eligible to do business in Ohio under O.R.C. § 3905.42, the sale of a motor vehicle service contract is a "consumer transaction" for purposes of the Ohio CSPA.

182.    In numerous instances over the previous two years, Call Originator Defendants and Individual Defendants violated Ohio's CSPA, O.R.C. § 1345.02(A) and (B)(1), by initiating telephone solicitations, directly or as a result of a third party acting on their behalf, which deceptively represented that the subject of the transaction had sponsorship, characteristics, benefits, particular standards, qualities or affiliations that it did not have.

183.    In numerous instances over the previous two years, Call Originator Defendants and Individual Defendants violated Ohio's CSPA, O.R.C. § 1345.02(A) and (B)(2), by initiating telephone solicitations, directly or as a result of a third party acting on their behalf, which deceptively represented that the subject of the transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not.

184.    In numerous instances over the previous two years, Call Originator Defendants and Individual Defendants violated Ohio's CSPA, O.R.C. § 1345.02(A) and (B)(9), by initiating telephone solicitations, directly or as a result of a third party acting on their behalf, which deceptively represented that the supplier has a sponsorship, approval, or affiliate that the supplier does not have.

185.    In numerous instances over the previous two years, Call Originator Defendants and

47

Individual Defendants violated Ohio's CSPA, O.R.C. § 1345.02(A), by initiating telephone solicitations, directly or as a result of a third party acting on their behalf, that unfairly or deceptively misrepresented the caller's ID by spoofing, which is the falsifying or disguising the identity of the telemarketer.

186. In numerous instances over the previous two years, Call Originator and Individual Defendants violated Ohio's CSPA, O.R.C. § 1345.02(A), by initiating telephone solicitations, directly or as a result of a third party acting on their behalf, that unfairly or deceptively misrepresented the caller's ID by rotating millions of phone numbers to be displayed on caller ID in the act known as snowshoeing, in an effort to frustrate consumers' efforts to screen, block, or otherwise avoid calls.

187. The acts or practices described in paragraphs 178-184 above have been previously determined by an Ohio court to violate the CSPA, O.R.C. § 1345.01 et seq. Defendants committed said violations after such decision was available for public inspection pursuant to O.R.C. § 1345.05(A)(3).

### COUNT X
### Violations of Ohio's Telephone Solicitation Sales Act

188. The Ohio TSSA, § O.R.C. 4719.01 et seq., requires nonexempt telephone solicitors that conduct telephone solicitations in Ohio to register with and file a copy of a surety bond with the Ohio Attorney General.

189. Call Originator Defendants are "telephone solicitors" as that term is defined in the Ohio TSSA, O.R.C. § 4719.01(A)(8), as they were, at all times relevant herein, engaged in initiating telephone solicitations, directly or through one or more salespersons, either from a location in Ohio or from a location outside Ohio to persons in Ohio. "Telephone solicitor" includes, but is not

limited to, any such person that is an owner, operator, officer, or director of, partner in, or other individual engaged in the management activities of a business. O.R.C. § 4719.01(A)(8).

190.    Call Originator Defendants initiated "telephone solicitations" to "purchasers," as they were at all times relevant herein engaged in initiating "communications" as, or on behalf of, "telephone solicitors" or through "salespersons" to represent the availability of "goods or services," or otherwise induce persons to purchase "goods or services," as those terms are defined in the Ohio TSSA, O.R.C. § 4719.01(A).

191.    At all times relevant to this Complaint, none of the Call Originator Defendants were registered as telephone solicitors with the Ohio Attorney General's Office pursuant to the Ohio TSSA, O.R.C. § 4719.02(A).

192.    In numerous instances over the previous two years, Call Originator Defendants committed unfair or deceptive acts and practices in violation of Ohio's CSPA, O.R.C. § 1345.02(A) and Ohio's TSSA, O.R.C. § 4719.02(A), by acting as telephone solicitors without first having obtained certificates of registration from the Ohio Attorney General.  These acts or practices have been previously determined by an Ohio court to violate the Ohio CSPA.  Defendants committed said violations after such decisions were available for public inspection pursuant to O.R.C. § 1345.05(A)(3).

193.    At all times relevant herein, Call Originator Defendants failed to have surety bonds on file with the Ohio Attorney General's Office as required by the Ohio TSSA, O.R.C. § 4719.04(A)

194.    In numerous instances over the previous two years, Call Originator Defendants violated Ohio's TSSA, O.R.C. § 4719.04(A), by acting as a telephone solicitor without first having obtained and filed with the Ohio Attorney General a surety bond issued by a surety company authorized to do business in the State of Ohio.

49

199.    Individual Defendants at all times pertinent hereto controlled and directed the business activities and sales conduct of at least one of the Call Originator Defendants, causing, personally participating in, benefiting from, or ratifying the acts and practices of at least one of Call Originator Defendants, including the conduct giving rise to the violations described herein, and are therefore liable for said violations of the TSSA.

## CONSUMER INJURY

200.    Consumers in Ohio and throughout the United States have suffered and will continue to suffer injury as a result of Defendants' violations of the TCPA, the TSR, the Ohio CSPA, and the Ohio TSSA. Absent injunctive relief by this Court, Defendants are likely to continue to injure consumers and harm the public interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff State of Ohio, pursuant to the TCPA, 47 U.S.C. § 227(g); the Telemarketing Act, 15 U.S.C. §§ 6103(a); the Ohio CSPA, § 1345.07; the Ohio TSSA, § 4719.22; and the Court's own equitable powers, request that the Court:

A.    Enter judgment against Defendants, and in favor of Plaintiff for each violation alleged in this complaint;

B.    Award Plaintiff such preliminary injunctive and ancillary relief as may be necessary to avert the likelihood of consumer injury during the pendency of this action and to preserve the possibility of effective final relief, including temporary and preliminary injunctions, and an order providing for the turnover of business records, immediate access to the records, the appointment of a receiver, and disruption of telephone services;

C.    Award Plaintiff permanent injunctive relief to prevent future violations of the TCPA, the TSR, the Ohio CSPA, and the Ohio TSSA by Defendants;

D.     Award Plaintiff such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TCPA, the TSR, the Ohio CSPA, and the Ohio TSSA;

E.     As to TCPA Counts I through IV, as provided by 47 U.S.C. § 227(g), assess against Defendants and in favor of Plaintiff State of Ohio damages of five hundred dollars ($500) for each violation of the TCPA or one thousand five hundred dollars ($1,500) for each violation of the TCPA the Court finds was committed by Defendants willfully and knowingly;

F.     As to TSR Counts V through VIII, enter judgment against Defendants and award Plaintiff such relief as the Court finds necessary to redress injury to consumers resulting from Defendants' violations of the TSR;

G.     Enter an order pursuant to O.R.C. § 1345.07(A)(l) declaring that Defendants' acts and practices as described in Count IX violate the Ohio CSPA, O.R.C. § 1345.01 *et seq.*, in the manner described, and that the violations alleged in paragraphs 178-184 occurred after decisions from Ohio courts determining those acts or practices violative of the Ohio CSPA were available for public inspection pursuant to O.R.C. § 1345.05(A)(3);

H.     Enter an order requiring Defendants to pay civil penalties to the Ohio Attorney General's Office pursuant to O.R.C. § 1345.07 in the amount of twenty-five thousand dollars ($25,000) for each violation of the Ohio CSPA;

I.     Permanently enjoin Defendants, their successors, agents, representatives, employees, and all person who act in concert with Defendants from engaging in acts or practices, as described in Count X that violate the Ohio TSSA;

J.     Enter an order pursuant to O.R.C. § 4719.12 requiring Defendants to pay civil penalties to the Ohio Attorney General's Office, in the amount of not less than one thousand ($1,000) nor more

than twenty-five thousand dollars ($25,000) for each violation of the Ohio TSSA as well as investigative costs and reasonable attorney's fees;

K.      Award Plaintiff the costs of bringing this action, as well as such other and additional relief as the Court may determine to be just and proper.

Dated:   July 7, 2022                    Respectfully Submitted,

                                         **DAVE YOST**
                                         **Ohio Attorney General**

                                         s/ Erin B. Leahy by s/ Christopher J. Belmarez per
                                         telephone authorization
                                         ERIN B. LEAHY *Trial Attorney* (OH Bar No.
                                         0069509)
                                         CHRISTOPHER J. BELMAREZ (OH Bar No.
                                         0101433)
                                         Assistant Attorneys General
                                         Ohio Attorney General's Office
                                         Consumer Protection Section
                                         30 E. Broad Street, 14th Floor
                                         Columbus, Ohio 43215
                                         (614) 752-4730 (Leahy)
                                         (614) 466-4455 (Belmarez)
                                         Erin.Leahy@OhioAGO.gov
                                         Christopher.Belmarez@OhioAGO.gov

                                         *Counsel for Plaintiff*
                                         *STATE OF OHIO*

## Appendix A

**"Individual Defendants"**
Received a monetary benefit for taking part in the lead generation common enterprise.
- Jones
- Cox
- Yim
- Bridge
- Batista
- Cedeno
- Szuromi
- Horvath

**"Call Originator Defendants"**
Operated to originate billions of calls aimed at citizens of Ohio and individuals throughout the United States.
- Technologic
- Virtual Hungary
- Davis Panama
- Sumco Panama
- Mobi
- Geist
- Fugle

**"VoIP Provider Defendants"**
Registered their corporate entities with the FCC as Interconnected VoIP service providers.
- Technologic
- Virtual Hungary
- Davis Panama
- Mobi
- Geist
- Fugle

**"Financial Shell Defendants"**
Facilitated payments between the company receiving the transferred call, Call Originator Defendants, and Individual Defendants; were owned, operated, directed, and otherwise controlled directly or indirectly by the above Individual Defendants.
- Technologic USA
- Connective MGMT
- Virtual US
- Tech Direct
- Davis US
- Posting Express
- Sumco USA