**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **STATE OF OHIO, et rel. ATTORNEY GENERAL DAVE YOST** | : | **Case No. 2:22-cv-02700** |
| | : | |
| **Plaintiff,** | : | **Judge Algenon L. Marbley** |
| | : | |
| **v.** | : | **Magistrate Judge Kimberly A. Jolson** |
| | : | |
| **AARON MICHAEL JONES, et al.** | : | |
| | : | |
| **Defendants.** | : | |

**<u>OPINION & ORDER</u>**

This matter is before the Court on Plaintiff's Motion for Default Judgment, Declaratory Judgment, Preliminary Injunction, and Monetary Relief. (ECF No. 203). The time for filing a response has passed, and Defendant has not responded. For the following reasons, Plaintiff's Motions are **GRANTED**, a **DEFAULT JUDGMENT** is entered against Defendant, and Plaintiff is awarded **$83,716,500.00** in damages.

Upon Plaintiff's Motion for Default Judgment and Permanent Injunction against Defendants Aaron Michael Jones, Stacey Eunjin Yim, Livia Szuromi, Davis Telecom Inc[1]., Virtual Telecom, Inc., Virtual Telecom, Kft, Technologic USA, Inc., Technologic, Inc., Connective Mgmt, Inc., Posting Express, Inc., Geist Telecom LLC, Fugle Telecom LLC, Sumco Panama USA, Sumco Panama SA., Mobi Telecom LLC, And Tech Direct LLC, (collectively, the "Defendants") the memorandum and exhibits in support of their motion, all filings and proceedings relevant to this motion, and all findings made by this Court, with sufficient reason, this Court finds the following:

[1] Davis Telecom, Inc. is Davis U.S., not Davis Telecom, Inc. based in Panama.

# I. FINDINGS OF FACT

## JURISDICTION AND VENUE

**1.** The State of Ohio brought this action pursuant to the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(g); the Telemarketing and Consumer Fraud and Abuse Prevention Act ("Telemarketing Act"), 15 U.S.C. § 6103(a), for Defendants' violations Federal Trade Commission's ("FTC") Telemarketing Sales Rule ("TSR"), 16 C.F.R. Part 310; the Ohio Consumer Sales Practices Act ("Ohio CSPA"), Ohio Rev. Code § 1345.07; and the Ohio Telephone Solicitation Sales Act ("Ohio TSSA"), Ohio Rev. Code § 4719.12, to obtain, permanent injunctive relief, damages, civil penalties and other equitable relief for Defendants' acts or practices that violate federal and state laws as described below.

**2.** The Defendants[2], in connection with the matters alleged herein, transact or have transacted business in the State of Ohio, and in this district; caused tortious injury by an act or omission in the State of Ohio, and in this district; caused tortious injury in this state by an act or omission outside this state, and regularly do or solicit business, or otherwise engage in any other persistent course of conduct, or derive substantial revenue from goods used or consumed or services rendered in the State of Ohio, and in this district; and caused tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when they might reasonably have expected that some person would be injured thereby in the State of Ohio, and in this district.

[2] Plaintiff's Motion does not address Defendants Roy Cox ("Cox"), Julie Bridge ("Bridge"), or Davis Telecom. Inc. ("Davis Panama"). As such, this case is still active as to Defendants Cox and Bridge.

**3.** Defendants Technologic USA, Inc ("Technologic USA"), Technologic, Inc. ("Technologic"), Connective MGMT Inc. ("Connective MGMT"), Virtual Telecom, Inc. ("Virtual US"), Davis Telecom, Inc. ("Davis US"), Tech Direct LLC ("Tech Direct"), Posting Express, Inc. ("Posting Express"), and Sumco Panama ("Sumco USA") are each a Financial Shell Defendant.

**4.** Defendants Virtual Telecom Kft ("Virtual Hungary"), Davis Telecom, Inc. ("Davis Panama"), Mobi Telecom, LLC ("Mobi"), Geist Telecom LLC ("Geist"), and Fugle Telecom LLC ("Fugle") are each a Call Originator Defendant and a VoIP Provider Defendant.

**5.** Defendant Sumco Panama, S.A. ("Sumco Panama") is a Call Originator Defendant.

**6.** Collectively, Call Originator Defendants, Financial Shell Defendants, and VoIP Provider Defendants are "Corporate Defendants."

**7.** The State of Ohio notified the Federal Communications Commission ("FCC") of this civil action pursuant to 47 U.S.C. § 227(g)(3).

**8.** The State of Ohio notified the FTC of this civil action pursuant to 15 U.S.C. § 6103(b).

## COMMERCE

**9.** At all times relevant to the Complaint, Defendants maintained a substantial course of trade in or affecting commerce, as "commerce" is defined in Section 4 of the FTC Act, 15 U.S.C. § 44.

## PLAINTIFF

**10.** The State of Ohio, by and through its Attorney General, Dave Yost, brought this action

in federal district court under 47 U.S.C. § 227(g)(l) on behalf of residents of the State of Ohio to enjoin violations of and enforce compliance with the TCPA, and to obtain damages of ($500.00 for each violation, and up to treble that amount for each violation committed willfully and knowingly.

**11.** The State of Ohio, as *parens patriae*, is authorized by 15 U.S.C. § 6103(a) to file civil actions in federal district court to enjoin violations of and enforce compliance with the TSR and to obtain damages, restitution, or other compensation on behalf of residents of the State of Ohio, or to obtain other relief as the Court may deem appropriate.

**12.** The State of Ohio is authorized under the laws of the State of Ohio to file civil actions to obtain declaratory judgments, enjoin violations, and seek orders for consumer damages, civil penalties of $25,000.00 for violations of the Ohio CSPA, Ohio Rev. Code § 1345.01 *et seq.* and its substantive rules, Ohio Adm. Code § 109:4-3-01 *et seq.*, to seek civil penalties of not less than $1,000.00 nor more than $25,000.00 for each violation of the Ohio TSSA, Ohio Rev. Code § 4719.01 *et seq.*, as well as investigative costs, reasonable attorneys' fees and any other appropriate relief.

**DEFENDANTS AND SERVICE**

**13.** On July 7, 2022, Plaintiff filed its Complaint against Defendants Aaron Michael Jones , Stacey Eunjin Yim, Julie Kathryn Bridge, Roy Cox, Livia Szuromi, Technologic USA, Technologic, Connective MGMT, Virtual US, Virtual Hungary, Davis Panama, Davis US, Tech Direct, Posting Express, Sumco USA, Sumco Panama, Mobi Telecom, Geist, and Fugle. Doc. 1, *Complaint*.

**14.** Defendant Aaron Michael Jones ("Jones" and an "Individual Defendant"), also known

as Mike Jones, is an actual or de facto owner, officer or member of all Corporate Defendants. At times material to the Complaint, acting alone or in concert with others, Jones had the authority and responsibility to prevent or correct the unlawful telemarketing practices of each of the Corporate Defendants, and has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of each Call Originator and Financial Shell Defendants, including the acts and practices set forth in the Complaint.

**15.** Jones is the spouse or domestic partner to Defendant Yim, and they reside together in Irvine, California.

**16.** Jones was served with the summons and Complaint on September 22, 2022, by ordinary mail and Jones' answer was due on October 20, 2022. Doc 26, *Certificate of Mailing by Clerk*.

Jones failed to plead or otherwise respond to the Complaint by that date.

**17.** Plaintiff filed an application for default against Jones on May 15, 2024. Doc 78, *Application for Clerk's Entry of Default Against Defendant Aaron Michael Jones.*

**18.** The clerk entered default against Jones on June 17, 2024. Doc 97, *Entry of Default*.

**19.** Defendant Stacey E. Yim ("Yim" and an "Individual Defendant") is an actual or de facto owner, officer or member of the Corporate Defendants. At times material to the Complaint, acting alone or in concert with others, Yim has had the authority and responsibility to prevent or correct the unlawful telemarketing practices of each Call Originator and Financial Shell Defendants and has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of each Call Originator and Financial Shell Defendants, including the acts and practices set forth in the Complaint. Yim is the spouse or domestic partner to Defendant Jones,

and they reside together in Irvine, California.

**20.** Yim was served with the summons and Complaint on March 19, 2023, by publication and Yim's answer was due on April 16, 2023. Doc 54, *Proof of Service*.

**21.** Yim failed to plead or otherwise respond to the Complaint by that date.

**22.** Plaintiff filed an application for default against Yim on May 15, 2024. Doc 89, *Application for Clerk's Entry of Default Against Defendant Stacey Yim*.

**23.** The clerk entered default against Yim on May 23, 2024. Doc 95, *Entry of Default*.

**24.** Defendant Livia Szuromi ("Szuromi" and an "Individual Defendant") is an officer and director of Sumco Panama, Sumco USA, and Davis US. At times material to the Complaint, acting alone or in concert with others, Szuromi has had the authority and responsibility to prevent or correct the unlawful telemarketing practices of Sumco Panama, Sumco USA, and Davis US, and has formulated, directed, controlled, had the authority to control, or participated in the acts and practices of Sumco Panama, Sumco USA, and Davis US, including the acts and practices set forth in the Complaint.

**25.** Szuromi was served with the summons and Complaint on April 7, 2025, pursuant to the Hague Convention in Budapest, Hungary and Szuromi's answer was due on May 5, 2025. Doc 170, *Proof of Service*.

**26.** Szuromi failed to plead or otherwise respond to the Complaint by that date.

**27.** Plaintiff filed an application for default against Szuromi on June 4, 2025. Doc 171, *Request to Enter Default of Livia Szuromi*.

**28.** The clerk entered default against Szuromi on June 5, 2025. Doc 172, *Entry of Default*.

**29.** Davis US is a former Wyoming corporation formed in June 2018 with its principal place of business in Cheyenne, Wyoming. Though Davis US has continued its business operations,

Defendant Szuromi, as president of Davis US, formally dissolved the corporation with the Wyoming Secretary of State's Office in April of 2021.

**30.** Davis US was served with the summons and Complaint on March 1, 2023, by certified mail and Davis US' answer was due on March 29, 2023. Doc 53, *Executed Certified Mail Green Card*. Doc 71, *Proof of Service*.

**31.** Davis US failed to plead or otherwise respond to the Complaint by that date.

**32.** Plaintiff filed an application for default against Davis US on May 15, 2024. Doc 80, *Application for Clerk's Entry of Default Against Defendant Davis Telecom, Inc*.

**33.** The clerk entered default against Davis US on May 23, 2024. Doc 95, *Entry of Default*.

**34.** Virtual US is a Wyoming corporation company formed in June 2016 with its principal place of business in Cheyenne, Wyoming.

**35.** Virtual US was served with the summons and Complaint on March 1, 2023, by certified mail and Virtual US's answer was due on March 29, 2023. Doc 53, *Executed Certified Mail Green Card*. Doc 70, *Proof of Service*.

**36.** Virtual US failed to plead or otherwise respond to the Complaint by that date.

**37.** Plaintiff filed an application for default against Virtual US on May 15, 2024. Doc 87, *Application for Clerk's Entry of Default Against Defendant Virtual US*. The clerk entered default against Virtual US on May 23, 2024. Doc 95, *Entry of Default*.

**38.** Virtual Hungary, also doing business as XYSM, is a foreign corporation with its principal place of business in Budapest, Hungary.

**39.** Virtual Hungary was served with the summons and Complaint on September 14, 2023, by fictitious service and Virtual Hungary's answer was due on October 12, 2023. Doc 68, *Proof of Service*.

**40.** Virtual Hungary failed to plead or otherwise respond to the Complaint by that date.

**41.** Plaintiff filed an application for default against Virtual Hungary on May 15, 2024. Doc 88, *Application for Clerk's Entry of Default Against Defendant Virtual Hungary*.

**42.** The clerk entered default against Virtual Hungary on May 23, 2024. Doc 95, *Entry of Default*.

**43.** Technologic USA is a Wyoming corporation formed in April 2015 with its principal place of business in Cheyenne, Wyoming.

**44.** Technologic USA was served with the summons and Complaint on March 1, 2023, by certified mail and Technologic USA's answer was due on March 29, 2023. Doc 53, *Executed Certified Mail Green Card*. Doc 74, *Proof of Service*.

**45.** Technologic USA failed to plead or otherwise respond to the Complaint by that date.

**46.** Plaintiff filed an application for default against Technologic USA on May 15, 2024. Doc 86, *Application for Clerk's Entry of Default Against Defendant Technologic USA*.

**47.** The clerk entered default against Technologic USA on May 23, 2024. Doc 95, *Entry of Default*.

**48.** Technologic is a foreign corporation with its principal place of business in Panama City, Panama.

**49.** Technologic was served with the summons and Complaint on July 25, 2025, by certified mail and Technologic answer was due on August 22, 2025. Doc 187, *Executed Certified Mail Green Card*.

**50.** Technologic failed to plead or otherwise respond to the Complaint by that date.

**51.** Plaintiff filed an application for default against Technologic on September 26, 2025. Doc 197, *Application for Clerk's Entry of Default Against Defendant Technologic*.

**52.** The clerk entered default against Technologic on October 1, 20925. Doc 199, *Entry of Default*.

**53.** Defendant Connective MGMT also doing business as XYSM, is a Nevada corporation formed in November 2015 with its principal place of business in Las Vegas, Nevada.

**54.** Connective MGMT was served with the summons and Complaint on August 29, 2022, by certified mail and Connective MGMT's answer was due on September 26, 2022. Doc 69, *Proof of Service*.

**55.** Connective MGMT failed to plead or otherwise respond to the Complaint by that date.

**56.** Plaintiff filed an application for default against Connective MGMT on May 15, 2024. Doc 79, *Application for Clerk's Entry of Default Against Defendant Connective MGMT*.

**57.** The clerk entered default against Connective MGMT on June 17, 2024. Doc 97, *Entry of Default*.

**58.** Defendant Posting Express is a Nevada corporation formed in May 2019 with its principal place of business in Las Vegas, Nevada.

**59.** Posting Express was served with the summons and Complaint on October 11, 2022, by ordinary mail and Posting Express' answer was due on November 8, 2022. Doc 18, *Executed Certified Mail Green Card*. Doc 75, *Proof of Service*.

**60.** Posting Express failed to plead or otherwise respond to the Complaint by that date.

**61.** Plaintiff filed an application for default against Posting Express on May 15, 2024. Doc 84, *Application for Clerk's Entry of Default Against Defendant Posting Express*.

**62.** The clerk entered default against Posting Express on May 23, 2024. Doc 95, *Entry of Default*.

**63.** Geist is a Wyoming limited liability company formed in October 2020 with its principal office in Sheridan, Wyoming.

**64.** Geist was served with the summons and Complaint on September 7, 2022, by certified mail and Geist's answer was due on October 5, 2022. Doc 18, *Executed Certified Mail Green Card*. Doc 72, *Proof of Service*.

**65.** Geist failed to plead or otherwise respond to the Complaint by that date.

**66.** Plaintiff filed an application for default against Geist on May 15, 2024. Doc 82, *Application for Clerk's Entry of Default Against Defendant Geist*.

**67.** The clerk entered default against Geist on May 23, 2024. Doc 95, *Entry of Default*.

**68.** Fugle is a Wyoming limited liability company organized in January 2021 with its principal office in Sheridan, Wyoming.

**69.** Fugle was served with the summons and Complaint on September 7, 2022, by certified mail and Fugle's answer was due on October 5, 2022. Doc 18, *Executed Certified Mail Green Card*. Doc 76, *Proof of Service*.

**70.** Fugle failed to plead or otherwise respond to the Complaint by that date.

**71.** Plaintiff filed an application for default against Fugle on May 15, 2024. Doc 81, *Application for Clerk's Entry of Default Against Defendant Fugle*.

**72.** The clerk entered default against Fugle on May 23, 2024. Doc 95, *Entry of Default*.

**73.** Sumco USA is a Wyoming corporation formed in January 2020 with its principal place of business in Sheridan, Wyoming.

**74.** Sumco USA was served with the summons and Complaint on September 7, 2022, by certified mail and Sumco USA's answer was due on October 5, 2022. Doc 18, *Executed Certified Mail Green Card*. Doc 77, *Proof of Service*.

**75.** Sumco USA failed to plead or otherwise respond to the Complaint by that date.

**76.** Plaintiff filed an application for default against Sumco USA on May 15, 2024. Doc 85, *Application for Clerk's Entry of Default Against Defendant Sumco USA*.

**77.** The clerk entered default against Sumco USA on May 23, 2024. Doc 95, *Entry of Default*.

**78.** Sumco Panama is a foreign corporation formed in March 2012 with its principal place of business in Panama City, Panama.

**79.** Sumco Panama was served with the summons and Complaint on January 29, 2025, by electronic mail and Sumco Panama's answer was due on February 26, 2025. Doc 139, *Notice of Successful Electronic Mail Service on Defendant Sumco Panama*.

**80.** Sumco Panama failed to plead or otherwise respond to the Complaint by that date.

**81.** Plaintiff filed a Request to Enter Default of Sumco Panama on April 3, 2025. Doc 156, *Request to Enter Default of Sumco Panama*.

**82.** The clerk entered default against Sumco Panama on April 7, 2025. Doc 159, *Entry*

*of Default*.

**83.** Mobi is a Wyoming limited liability company formed in June 2020 with its principal place of business in Sheridan, Wyoming.

**84.** Mobi was served with the summons and Complaint on September 7, 2022, by certified mail and Mobi's answer was due on October 5, 2022. Doc 18, *Executed Certified Mail Green Card*. Doc 73, *Proof of Service*.

**85.** Mobi failed to plead or otherwise respond to the Complaint by that date.

**86.** Plaintiff filed an application for default against Mobi on May 15, 2024. Doc 83, *Application for Clerk's Entry of Default Against Defendant Mobi*.

**87.** The clerk entered default against Mobi on May 23, 2024. Doc 95, *Entry of Default*.

**88.** Tech Direct is a Wyoming limited liability company formed in February 2019 with its principal place of business in Sheridan, Wyoming.

**89.** Tech Direct waived service of the summons and Complaint on September 30, 2022, and Tech Direct's answer was due on October 28, 2022. Doc 36, *Waiver of the Service of Summons*.

**90.** Tech Direct failed to plead or otherwise respond to the Complaint by that date.

**91.** Plaintiff filed an application for default against Tech Direct on May 22, 2024. Doc 93, *Application for Clerk's Entry of Default Against Defendant Tech Direct*.

**92.** The clerk entered default against Tech Direct on May 23, 2024. Doc 95, *Entry of Default*.

## II. BACKGROUND

**93.** Each of the Defendants, acting individually, as well as collectively through the

common enterprise, have participated in an unlawful robocall operation that bombarded Ohio residents with at least 800 million illegal robocalls from July 2018 through at least July 2021. This call volume is equivalent to calling every person in Cincinnati twice a day for over 1,000 consecutive days without consent.

**94.** Defendants, through their "lead generation" services, provided prequalified/prescreened leads in which a robocall advertised the availability of "goods or services," or otherwise was meant to induce the recipient of the call to purchase goods or services when he or she met certain criteria. When possible, Defendants provided clients with live transfer of the lead while the prospective consumer was still on the phone with Defendants or their agents. By providing lead generation services, Defendants arranged for VSC marketers to provide goods or services to customers in exchange for consideration.

**95.** In the same period, Call Originator Defendants originated hundreds of millions of robocalls aimed at residents of Ohio. A prerecorded message greeted individuals who answered and then prompted them to respond by pressing number options. If the individual responded, Defendants would prescreen and, when possible, instantaneously transfer the individual to one of their clients paying for sales leads.

**96.** Call Originator Defendants contracted with a number of different Voice over Internet Protocol ("VoIP") service providers to obtain service through which they initiated the robocalls to call recipients. VoIP is a technology which allows users to make voice calls using broadband internet instead of analog or cellular phone services. Further, Call Originator Defendants used internationally-based cloud servers to mask the origin of the calls.

**97.** To conceal their robocall operation and in furtherance of the common enterprise, Call Originator Defendants, except Sumco Panama, registered with the FCC as Interconnected VoIP service providers (collectively "VoIP Provider Defendants" where necessary to delineate between the overlapping Call Originator Defendants).

**98.** Financial Shell Defendants obtained bank accounts that facilitated receiving money from Call Originator Defendants' clients, paid proceeds to the Individual Defendants, and paid for services necessary to the common enterprise. Financial Shell Defendants were owned, operated, directed, and otherwise controlled by the Individual Defendants and were also purported to be owned, operated, directed, and otherwise controlled by the below described Straw Directors.

**99.** Jones, the ringleader of this common enterprise, is a recidivist robocaller. Jones has been sued three times for unlawful robocalling, twice by the FTC in 2017 and 2019 and once by the State of Texas in 2011.[3] By engaging in the scheme alleged in the Complaint, Jones is violating multiple permanent injunctions that banned him from engaging in telemarketing or assisting others engaged in telemarketing.[4]

**100.** Jones, Yim, and Szuromi (collectively "Individual Defendants"), received a monetary benefit for taking part in the lead generation common enterprise. Individual Defendants performed various functions in the enterprise such as owning and operating companies involved in the complex scheme, directing the same companies, or otherwise participating in and facilitating the

---

[3] *See*, *FTC v. Aaron Michael Jones*, No. 8:17-cv-00058 (C.D. Cal); *FTC v. Pointbreak Media, LLC*, No. 0:18-cv-61017 (S.D. Fla.); *State of Texas v. SCM Media, Inc*, No. A-09-cv-387 (W.D. Tex).

[4] *See*, *FTC v. Aaron Michael Jones*, No. 8:17-cv-00058 (C.D. Cal); *State of Texas v. SCM Media, Inc*, No. A-09-cv387 (W.D. Tex).

same.

**101.** Danila Hardon, Maria Alejandra Gonzalez, Davinder Singh, and Adam Radimiri (collectively "Straw Directors") are additional individuals or aliases involved in the common enterprise. These Straw Directors' names were used to sign documents and appear on FCC filings. They, however, do not appear to receive any compensation from the Defendants. Moreover, nothing in the Plaintiff's investigation provides evidence that the Straw Directors are individuals that actually exist. The Straw Directors—or the use of their names—provide clear links between Defendants in the common enterprise and show the interconnectedness of the Defendants.

**DEFENDANTS' BUSINESS ACTIVITIES**

**102.** Defendants, directly or through one or more intermediaries, have engaged in the business of generating and selling sales leads, through a complex robocall scheme and other telemarketing, for a variety of products and services. Defendants receive compensation from the scheme on a per-lead basis and, at times, also receive commissions on sales that result from provided leads.

**103.** Defendants blasted hundreds of thousands of VSC robocalls per day that deceptively induced consumers to stay on the line for Defendants to connect them as leads to VSC marketers.

**104.** Consumers who answered Defendants' robocalls were greeted with the following prerecorded message, or a very similar version:

> This is an urgent message for the vehicle owner. We have been trying to reach you about your car's extended warranty. You should have received something in the mail about your car's extended warranty. Since we have not gotten a response, we are giving you a final courtesy call before we close out your file. Press two to be removed and be placed on our do not call list, press one to speak with someone about possibly extending or reinstating your car's warranty. Press one to speak with a warranty specialist.

**105.** Consumers who "press one" are typically transferred to live operators in call centers or

to an automated system employing interactive voice response or artificial intelligence bot technology to "qualify" or pre-screen the consumers' interest in purchasing a VSC. In some instances, consumers who hold for a live person to request no further calls end up with abrupt disconnections rather than having their do not call requests recorded by the telemarketers.

**106.** During the qualifying or prescreening process, Call Originator Defendants' live operator or the automated response technology identify the telemarketer or seller generically as the "vehicle service department" or a similar name. Consumers are then asked to "verify" the year, make, and model of their vehicle and the mileage so that the telemarketer can "look up their file."

**107.** Consumers who provide answers to the pre-screening questions are informed that the call will be transferred to a "licensed" or "authorized" representative, at which point consumers are transferred to VSC marketers to complete the sale. This process is known in the telemarketing industry as a "live transfer lead." Generally, in the industry, if there is no VSC sales agent available to accept the live transfer lead, any contact information gleaned from the potential lead is still sold.

**108.** In numerous instances, Call Originator Defendants initiated robocalls that misrepresented, directly or by implication, through their prerecorded messages that:

a. they are calling from or on behalf of consumers' car dealers or manufacturers;
b. they know that the consumers' original warranties are about to expire;
c. they sell extensions or can reinstate the consumers' original warranties; and
d. the purpose of the call is to follow up on existing "files" or business relationships with the consumers.

**109.** In fact, the Call Originator Defendants:

a. are not calling from or on behalf of consumers' car dealers or manufacturers;
b. do not know whether the consumers' car warranties are about to expire;
c. have no authority or ability to "extend" or "reinstate" consumers' original warranties;
d. are not calling to follow up on an existing business relationship; and
e. are misrepresenting the true purpose of the call, which is to solicit the sale of VSCs, which do not have the same legal characteristics and protections of a manufacturer's warranty.

**110.** Between 2018 and 2021, Financial Shell Defendants received over $12.9 million from at least 13 entities that sell VSCs to Ohio consumers.

**111.** Tech Direct, Virtual US, and Virtual Hungary entered into agreements with VSC marketers, in which they agreed to provide the VSC marketers with "billable leads," which were generated through methods including the use of robocalls.

**112.** For example, in 2020, a Florida VSC marketer that solicited Ohio residents paid over $1.4 million to Tech Direct, Virtual US and Davis US. In January 2020, Straw Director Gonzalez signed two contracts, one on behalf of Tech Direct and one on behalf of Virtual Hungary, to provide "billable leads" to the VSC marketer. The two contracts were nearly identical, described the marketed product as "Vehicle Service Coverage," stated that the purpose was to generate calls for the Florida VSC marketer, and described the nature of the service provided to the VSC marketers as leads, i.e. "sourcing consumers." The contracts, in part, stated:

> Vendor is in the business of sourcing consumers (each, a "Prospect") who have confirmed an interest in purchasing the Business through [VSC marketer] and/or its affiliate or customer.

**113.** In another example, between January 2018 and May 2020, a California VSC marketer that solicited Ohio residents made payments to Virtual US, Tech Direct, and Connective MGMT totaling over $3.1 million. In November 2018, Straw Director Gonzalez, as Vice President and General Manager, signed a contract on behalf of Virtual Hungary, to sell "billable leads" to the California VSC marketer. The contract language is nearly identical to other Vendor Services Agreements used by other Corporate Defendants.

**114.** The contract as described in the above paragraph, as between the California VSC marketer and Virtual Hungary, was terminated by the California VSC marketer "as it was

concerned regarding potentially problematic calls that Virtual Telecom may have placed."

**115.** Call Originator Defendants, by transferring leads to many different independent sellers, make it difficult to impossible for consumers to know which company initiated or made the robocall.

**116.** Call Originator Defendants masked the origin of their VSC robocalls, by failing to disclose the identity of the telemarketer(s) or seller(s) on whose behalf the call was made and by transmitting inaccurate caller ID information or causing inaccurate caller ID information to be transmitted (known as "spoofing").

**117.** For example, from July 2018 through December 2019, Virtual Hungary initiated over 1.7 billion outbound calls to 470 million unique telephone numbers. The spoofing pattern was evident as Virtual Hungary transmitted over 510 million unique numbers for caller ID purposes. At least 64 million of the spoofed calls were directed to telephone numbers with Ohio area codes Virtual Hungary made calls, in some instances more than once, that spoofed, among other numbers, phone numbers currently assigned to the U.S. District Court for the Southern District of Ohio's office and staff.

**118.** In December 2019, Congress enacted the Pallone-Thune Telephone Robocall Abuse Criminal Enforcement and Deterrence Act (hereinafter "the TRACED Act") to combat the scourge of unlawful robocalls. See Pub. L. No. 116-105, § 13(d), 133 Stat. 3274 (2019). Following its enactment, the FCC designated the Industry Traceback Group ("ITG") as the official traceback consortium charged with leading the telecommunications industry's efforts to trace the origin of suspected illegal robocalls through various telecommunications networks through tracebacks.

**119.** A traceback identifies each of the providers through which the call passed when it traveled from the originating service provider (caller's provider) to the terminating provider (call

recipient's provider).

**120.** To increase the number of phone numbers available to use for caller ID, VoIP Provider Defendants purchased or leased massive quantities of unique telephone numbers. This allowed Call Originator Defendants to use millions of numbers on a short-term basis to initiate calls that show up on the recipient's caller ID but could be non-working numbers for incoming calls. This strategy of spreading robocalls across many different originating numbers is known as "snowshoeing," which allows illegal robocallers to hinder call blocking and call labeling analytics, as well as evade the ITG traceback process.

**121.** Through simultaneous contracts with multiple VoIP service providers, Call Originator Defendants were able to purchase or lease the assignment of over 2 million unique phone numbers in just over one year to "refresh" their inventory of caller ID numbers, any of which could be used to call Ohio Call Originator Defendants also engaged in "neighbor spoofing," which is the use of caller ID numbers with the same area code and the same or similar three-digit exchange of the call recipient to increase the odds of the call recipient answering the call.

**122.** From October 2019 through March 2022, the ITG identified Call Originator Defendants in tracebacks for at least 314 campaigns pertaining to VSC offers. The ITG defines a robocall "campaign" as a group of calls with identical or nearly identical messaging as determined by the content and calling patterns of the caller. A single campaign often represents hundreds of thousands or millions of calls.[5]

**123.** During the relevant time frame, Defendants initiated, or caused to be initiated, calls to consumers in Ohio that delivered prerecorded messages that advertised "car warranties" and other

---

[5] INDUSTRY TRACEBACK GROUP, POLICIES AND PROCEDURES, REVISED APRIL, 2022 (2022), https://tracebacks.org/wpcontent/uploads/2022/04/ITG-Policies-and-Procedures-Updated-Apr-2022.pdf

products or services without first having obtained prior express written agreements from the call recipients to receive prerecorded calls by or on behalf of any Defendants.

**124.** Call Originator Defendants initiated outbound telephone calls to both cellular and residential Ohio telephone numbers that delivered prerecorded messages to induce the sale of goods or services when the persons to whom these telephone calls were made had not expressly agreed, in writing, to authorize the seller to place prerecorded calls to such persons.

**125.** Defendants engaged in abusive telemarketing practices by initiating, or causing to be initiated, robocalls to Ohio numbers without first obtaining valid, prior express written consent from call recipients and by calling telephone numbers listed on the DNC Registry.

**126.** At times Call Originator Defendants claimed to have "consent" received through alleged "opt in" websites to place robocalls to consumers, including to numbers on the DNC registry.

**127.** Many of these websites were entirely unrelated to the automotive industry, often did not contain any VSC or auto warranty language, and purportedly would simultaneously give consent to many entities.

**128.** For example, when a VoIP Provider of Sumco Panama had to respond to an ITG traceback request, Sumco Panama needed to "buy some time" before responding in order to add "auto services" language to the list of opt-in websites in the terms and conditions after many VSC robocalls were made based on the alleged "opt in" from these websites.

**129.** For example, websites from which Call Originator Defendants claimed to have received consent to telemarketing VSCs including, but not limited to:

http://www.pharmnet.com
http://www.lowestmed.com
http://www.goodrx.com
http://www.internationaldrugmart.c

om/ https://mortgageadvisor.com/
https://smartfinancial.com/health-
insurance
https://www.usarewardspot.com/ThankYou.aspx?sou
rce=P" https://www.thelawyerdirectory.com/tax-law/
https://www.digitalmarketmedia.com/publishersform
/ https://bloodsugarpresentation.com/
https://tax-debt.net/
https://go.lifestreamlab.com/mobile/v2.0/
https://rent2ownhelper.com/
https://homesolarus.com/demo/?tabname=de
mo https://extraessay.com/
https://www.loansonline.com/
https://www.oneparkfinancial.com/lp/business-
loans-today https://www.elocal.com/affiliate-
contact https://www.247autowarranty.com

**130.** A number of Ohio residents who received robocalls by or on behalf of Defendants specifically refute opting in or giving consent to receive any prerecorded message calls about auto warranties to their cellular or residential numbers.

**131.** For example, on or about July 31, 2020, Ohio resident J.S. received a VSC robocall on his cellular number which had been listed on the DNC Registry for several years. Shortly thereafter,

J.S. filed a consumer complaint with the Ohio Attorney General's Consumer Protection Section and provided a signed declaration indicating that he did not give consent to Defendants to call him using prerecorded messages.

**132.** For example, on or about June 1, 2020, Ohio resident D.W. began receiving VSC robocalls from Defendants. Shortly thereafter, D.W. filed a consumer complaint with the Ohio Attorney General's Consumer Protection Section and provided a signed declaration. In the declaration,

D.W. indicated that she did not give consent to Defendants to call her cellular or landline telephone numbers using prerecorded messages.

**133.** For example, on or about July 17, 2020, Ohio resident L.H. received a VSC robocall from Defendants. Shortly thereafter, L.H. filed a consumer complaint with the Ohio Attorney General's Consumer Protection Section and provided a signed declaration. In the declaration, L. H. indicated that she did not give consent to Defendants to call her cellular telephone number to deliver prerecorded messages. Further, her telephone number had been listed on the DNC Registry for several years.

**134.** At times material to the Complaint, over 1,600 unwanted call complaints filed with the Ohio Attorney General's Consumer Protection Section were determined to have originated with Call Originator Defendants.

**135.** Call Originator Defendants' robocalls have been the subject of thousands of consumer complaints filed with the FTC's Consumer Sentinel Do Not Call database, a national clearinghouse, where the calls described in the complaints were determined to be originated by Call Originator Defendants. Over 3,100 of those complaints filed with the FTC were associated with Ohio telephone numbers where the complainant confirms they were Ohio residents.

**136.** Between July 2018 and June 2021, Defendants initiated or caused to be initiated at least 250 million outbound telephone calls to telephone numbers with Ohio area codes on the DNC Registry.

**137.** At times material to the Complaint, Call Originator Defendants initiated outbound calls to persons who had previously requested to opt-out from future calls from Defendants. Numerous consumers reported receiving additional calls despite following the prompt in the previous call's prerecorded message to press two "to be removed and put on our do not call list."

**138.** After receiving at least eight VSC robocalls from Call Originator Defendants to his cellular number listed on the DNC Registry, Ohio resident T.D. filed a consumer complaint with

the FTC on September 8, 2020, stating:

> Auto Warranty Scam. I've repeatedly elected the DO NOT CALL option, but they keep calling from new number each time. The number is legitimate - if you call it back, you get their recording. Please make it stop. It's several times per day.

Between March 20, 2020 and February 19, 2021, Defendants placed at least 31 calls to T.D.

**139.** After receiving at least seven robocalls from Call Originator Defendants to her cellular number listed on the DNC Registry, Ohio resident A.H. filed a consumer complaint with the FTC on August 13, 2020 stating:

> In order to request they stop calling me, I had to dial the number that called me and deal with an automated system and press a number. They have been calling me from VoIP numbers while I'm at work, while I'm at church, while on calls with other people, never leaving voicemails and when I do chance answer, have been rude and yell at me or deal with an automated message if they do choose to leave a voicemail. I signed up for the do not call registry for a reason, so these harassing calls would stop, and they did for a bit, but are now increasing again.

A.H. filed a second complaint on August 31, 2020, stating:

> Second time I had to do a call back to request my number be removed from their list. I have no warranties on any of my vehicles, never have I had any warranties on my vehicles. They have been calling me while at work mostly, never leave voicemails, always using VoIPs which I block from my phone and they call from another VoIP number. These calls NEED TO STOP, I'm beyond annoyed with them and these are clearly scam calls.

Between August 31, 2020 and February 24, 2021, A.H. received at least 17 additional calls from Call Originator Defendants.

**140.** At times material to the Complaint, Defendants initiated or caused to be initiated many telephone calls to Ohio numbers that delivered prerecorded messages that failed to disclose the identity of the telemarketer or seller on whose behalf the call was made.

**141.** In numerous instances, Defendants initiated or caused to be initiated many telephone calls to Ohio numbers that delivered prerecorded messages, which included advertisements, but failed to provide the name of the seller or telemarketer that was registered with the state's secretary of state offices or comparable agency.

## COMMON ENTERPRISE

**142.** At various times material to the Complaint, Call Originator Defendants and Financial Shell Defendants have operated as a common enterprise while engaging in the acts and practices alleged in the Complaint. Defendants have conducted these acts and practices through a maze of interrelated corporations and limited liability companies that have strongly interdependent economic interests, operate under common control, with common actual or de facto officers and/or members, with common business functions, and share business resources typically shared in an office, such as common Internet Protocol ("IP") addresses and the use of commingled funds. Because these Defendants have operated as a common enterprise, each is jointly and severally liable for the acts and practices alleged below.

**143.** At various times material to the Complaint, Individual Defendants formulated, directed, controlled, had the authority to control, or participated in the acts and practices, directly or indirectly, of one or more Call Originator Defendants and Financial Shell Defendants that constitute the common enterprise. The Individual Defendants each had knowledge of the unlawful acts and practices used in furtherance of the common enterprise.

**144.** Call Originator Defendants contract with VSC marketers to generate leads through robocalls. Call Originator Defendants often also act as VoIP Providers to mask the origin of the calls in traceback requests, acting in two capacities for the common enterprise. Additionally, some Financial Shell Defendants contract with VSC marketers, as well as receive and make payments on behalf of Call Originator Defendants.

**145.** Corporate Defendants often use their business names interchangeably such that they lack separate identities. A number of their accounts set up to obtain VoIP services have more than one of the Corporate Defendant business names associated with the accounts. There are numerous

instances where Call Originator Defendants and Financial Shell Defendants contract with service providers using multiple business names or contract as Call Originator Defendant, but the payment comes from a Financial Shell Defendant.

**146.** For example, the email addresses used for a Paypal account opened by Fugle in August 2020 illustrate the interchangeable nature of Corporate Defendants' business names and the intention to comingle funds for Fugle, Geist, and Mobi in the account. Fugle provided three email addresses for its Paypal account, including:

a. fugletelecom@protonmail.com;
b. info@geisttelecom.net; and
c. mobitelecom@protonmail.com.

**147.** Defendants utilize common resources, much like a company that shares an office. For example, Call Originator Defendants used common IP addresses, which is analogous to using the same phone in an office space or utilizing a common computer in an office to send business emails.

**148.** Call Originator Defendants obtained VoIP service to initiate calls from at least six different VoIP providers and utilized common IP addresses or IP addresses with ties to the same account for call signaling. The IP address is the signal, or designated place, from which calls are sent, and may also be the signal at which they are received, which acts, in a way, like a telephone number or shared computer.

**149.** Call Originator Defendants communicated using shared Skype Live IDs with various business vendors, including several VoIP service providers.

**150.** Call Originator and Financial Shell Defendants share the common business purpose of furthering the lead generation scheme through robocalls and forwarding live transfer calls to waiting call centers for VSC marketers.

**151.** Despite VoIP Provider Defendants having registered with the FCC as Interconnected VoIP service providers, in addition to the sale of VoIP minutes, the primary business function was

to sell lead services generated through robocalls and other telemarketing.

**152.** Call Originator Defendants and Financial Shell Defendants have some common business functions as they both contract with VSC marketers and/or VoIP providers in furtherance of the robocall operation.

**153.** Financial Shell Defendants obtained bank accounts that received money from clients, paid for necessary services, and paid proceeds to the Individual Defendants.

**154.** Call Originator and Financial Shell Defendants have common actual or de facto corporate officers, members, or directors as described above.

**155.** Call Originator and Financial Shell Defendants share common beneficial or de facto ownership and control by Individual Defendants Yim and Jones.

**156.** Individual Defendants participated in the common enterprise and directly or indirectly benefited from it through financial gain. Additionally, Individual Defendants are owners, directors, or signatories of bank accounts for the common enterprise corporations and LLCs.

**157.** Jones's involvement with and acts in furtherance of the common enterprise include:

a. Jones (through Yim), received the majority of the proceeds of the common enterprise.

b. Jones's partner, Yim, received over $2 million from a single Financial Shell Defendant, Connective MGMT. The signatory on Connective MGMT's account was a nonparty, but Jones's email address was associated with the account.[6]

c. Connective MGMT paid for a portion of Jones's legal expenses in a civil case he brought against two co-defendants from a prior FTC civil action.

d. Connective MGMT closed the account after significant funds were wired into an account under the name of Tech Direct.

e. Jones received funds for his benefit indirectly from Call Originator Defendants' and Financial Shell Defendants' accounts.

f. In late 2019, Jones contacted a provider of artificial intelligence (AI) bots to design, for his business, a voice-prompted, conversational bot platform to use with

[6] The nonparty signatory on the Connective MGMT account is Andrew Yoshioka, a known associate of Jones and one of Jones's co-defendants in FTC v. Aaron Michael Jones, No. 8:17-cv-00058 (C.D. Cal).

telephone service to respond to customer service calls. He requested that the bot be designed to prescreen callers regarding their interest in a vehicle warranty (despite actually marketing a VSC) using the following script, and then transfer interested callers on to a live operator:

Hi, this is Diana calling from Vehicle Service Department. We're doing your scheduled warranty checkup. Our system indicates you have yet to extend factory warranty. Have you received any of the final notifications sent out to you? Could you please verify the year, make and model of your vehicle so I can look up your file? Okay, approximately how many miles are on your vehicle? Okay, now I'm going to bring a license representative online to go over all the information with you.

Interested callers were then transferred on to live calls.

g. Jones gave the specifications, which matched the prescreening requirements of the VSC marketer contracts, that the bot provider used to develop the bot. The bot was set to receive inbound calls from two IP addresses and, after interacting with the virtual bot, potentially interested consumers were routed/transferred to another IP address Jones provided.

h. Some of the common IP addresses used by Call Originator Defendants overlap with two IP addresses Jones gave to the bot provider or otherwise tie to a shared internet service account.

i. In early 2020, the bot provider sent invoices to Jones related to the voice-prompted bot. The invoices were paid by Tech Direct.

j. Following a payment by Posting Express, Jones received 300,000 shares of the bot provider's preferred stock, which gave Jones a 3% ownership in the bot provider.

**158.** Yim's involvement with and acts in furtherance of the common enterprise include:

a. Yim's personal participation in the robocall operation is primarily tied to the transfer of funds throughout the common enterprise.

b. The great majority of the funds flowing from Call Originator Defendants went to Yim through Financial Shell Defendants.

c. Yim received proceeds from Tech Direct, Virtual US, and Sumco Panama.

d. Yim is an officer for Posting Express and is the sole signatory on the bank accounts for Posting Express.

e. Yim's Posting Express account paid money to the bot provider, in exchange for Jones receiving preferred stock in the bot provider.

f. Yim's Posting Express account paid for a portion of legal expenses for Defendant Jones in a civil case against two of his co-defendants in an FTC civil action.

g. Yim's Posting Express paid for Yim's personal expenses, such as her American Express credit card bill, daily expenses, Yim's car payments through Mercedes Benz Financial Services, and a cruise vacation.

h. In 2021, Posting Express paid $232,000 in "capital contributions" to a

Florida VSC marketer, and received $385,000 labeled as "distribution payments" from the same seller. Yim earned commission from sales that resulted from leads provided to this Florida VSC marketer.

i. Yim also has an ownership interest in this Florida VSC marketer for which the robocall operation is generating leads.

j. Yim benefited financially from the robocall scheme individually, and also used the scheme to generate sales leads for contracts being sold by the Florida VSC marketer in which she has an ownership interest.

**159.** Szuromi's involvement with and acts in furtherance of the common enterprise include:

a. Szuromi is listed as the Director/Secretary of Sumco Panama on the company's publicly available registration documents for the government of Panama.

b. Szuromi is an officer and director of Sumco Panama, Sumco USA, and Davis US, and is the signatory on a bank account for Davis US, which paid for services used in the initiation of illegal robocalls.

**160.** Individual Defendants, using Straw Directors, obscured the relationship between the Defendants in the robocall scheme in furtherance of the common enterprise.

**161.** The Straw Directors described in Paragraph 106 appeared to serve as officers or members of Corporate Defendants. The use of Straw Directors further illustrates the links between Defendants in the complex robocall lead generation scheme.

**162.** Straw Director Hardon's role in the common enterprise include:

a. Hardon is listed as the Chief Executive Officer on Technologic's FCC VoIP filing and signed contracts with two VoIP service providers, among others, for Technologic as its VP General Manger.

**163.** Straw Director Gonzalez's role in the common enterprise include:

a. Gonzalez has been identified as the president of Technologic on the company's VoIP provider FCC filings.

b. Gonzalez signed multiple contracts to provide leads for VSC marketers both on behalf of Virtual US as the "Gen Man & Vice Pres" and Tech Direct.

c. Gonzalez signed contracts to obtain VoIP services on behalf of Virtual Hungary.

d. Gonzalez signed an FCC form with a VoIP service provider on behalf of Davis US as Vice President and General Manager.

e. Showing the interconnectedness of Gonzalez's roles with Defendants, she used the email support@virtualtelecom.hu when signing the contract on behalf of Tech Direct. Additionally, a Sumco Panama email address was used in sending a

contract signed by Gonzalez between Virtual Telecom and a VoIP service provider.

**164.** Straw Director Singh's role in the common enterprise include:

a. Singh is listed as Chief Executive Officer of Mobi on FCC VoIP Provider records.

b. Singh signed contracts with VoIP service providers, as well as other documents on behalf of Mobi, representing he was President of Mobi.

**165.** Straw Director Radimiri's role in the common enterprise include:

a. Radimiri is listed as Chief Executive Officer of Geist on an FCC VoIP Provider record and signed multiple contracts on behalf of Geist.

## PIERCING THE CORPORATE VEIL

**166.** Defendants operate with coordinated efforts designed to create layers of protection to the beneficiaries of the scheme. Jones has historically moved on from litigation against his robocall operating companies or financial shell companies by shutting them down and opening different companies to engage in new, but often strikingly similar, schemes. In this instance, Individual Defendants have knowingly directed and controlled this fraudulent scheme. Along with all Individual Defendants, the repeat offender Jones is engaged in these very tactics to protect his ill-gotten gains. Individual Defendants, and any other individual who received a monetary payment or benefit structured to evade civil liability, should not be able to hide behind the corporate veil. The Defendants showed no respect for corporate formalities. The corporations and LLCs were created and operated with fraudulent intent, and to allow Defendants to evade liability would allow an injustice to occur.

**167.** Defendants demonstrated a complete lack of respect as to the separate identities of each of the business entities and failed to adhere to minimal standard business formalities such as complying with corporate laws or regulations to maintain business registrations with their respective state's Secretary of State offices and the FCC with respect to their telecommunications provider registrations.

**168.** In particular, some Financial Shell Defendants are listed as inactive by the relevant Secretary of State for failing to maintain registration requirements.

**169.** VoIP Provider Defendants were each registered as VoIP providers but failed to maintain practices that would be typical of telecommunications service providers. For example, no VoIP Provider Defendants have public facing, operational websites where their services are offered.

**170.** The TRACED Act made it mandatory for voice service providers[8] to file robocall mitigation plans with the FCC by June 30, 2021. Additionally, pursuant to the TRACED Act, all service providers are required to respond to traceback requests from the FCC, civil or criminal law enforcement, or the consortium.[9]

**171.** In May 2021, Mobi filed a Robocall Mitigation Plan with the FCC, as required by the FCC. However, Virtual Hungary, Technologic, Geist, and Fugle have failed to make filings.

**172.** VoIP Provider Defendants have failed to respond to at least some ITG traceback requests.[7]

**173.** As described in Paragraphs 148-172, Defendants treated the corporate identities as interchangeable, showing no respect for the corporate formalities.

**174.** Jones and Yim, through their combined knowledge, experience, and contributions to the common enterprise, have operated in such a way that separate personalities of the corporations and owners do not truly exist. They are vital to the current operation, and the proceeds received by them indicate they are the beneficial owners of Financial Shell and Call Originator Defendants as described in Paragraphs 163-164.

**175.** Jones, because of his previous civil actions for strikingly similar illegal robocall

[7] See 47 C.F.R. § 64.1200(n) (2022).

operations, has demonstrated that he has knowledge of his wrongdoings and has further demonstrated through previous litigation that he is willing and able to dissolve one business and form another.

**176.** To evade civil liability to potential plaintiffs, Jones set up an elaborate scheme through the common enterprise and used all other named Defendants to shield himself from liability.

**177.** As opposed to money going directly to Jones, on information and belief, Jones's domestic partner, Yim, receives proceeds from the complex scheme and shares those proceeds with Jones.

**178.** Corporate Defendants were fraudulently formed to shield Jones from liability. Upon formation, the corporations did not follow corporate formalities such as paying taxes, issuing stock, holding annual meetings, or acting as a VoIP Provider without following the required formalities.

**179.** Individual Defendants have each directly or indirectly participated, controlled, or were in positions of authority for one or more of the Corporate Defendants in the common enterprise.

**180.** The corporations and LLCs formed by Defendants were created to shield Jones and Yim from liability and create a complex and layered scheme.

**181.** Allowing Individual Defendants to use a corporate veil to escape liability for their roles in a deceptive scheme that subjected Ohioans to hundreds of millions of illegal robocalls would sanction fraud and injustice. Individual Defendants should not be protected by hiding behind their numerous corporations or limited liability companies, including those outside of the country.

## <u>Definitions</u>

**182.** "VoIP" means Voice over Internet Protocol.

**183.** "VoIP Services" means (1) one-way or interconnected VoIP telephony services, including, without limitation, the origination, termination, routing, or transmission of telephone calls made over a public switched telephone network and which requires VoIP-related technology and (2) the resale, assignment, licensing, or provisioning of telephone numbers, including, without limitation, telephone numbers associated with direct inward dialing.

**184.** "Lead Generation" means the assignment, creation, sourcing, sale, subscription, leasing, renting, distribution, provisioning, purchase, reselling, wholesaling, or transfer of any list or compilation of telephone numbers utilized or intended to be utilized for the purpose of generating or initiating Outbound Telephone Calls and/or Telemarketing.

**185.** "Communication" means any contact, whether formal or informal, between two or more Persons, at any time or place, and under any circumstances whatsoever, whereby information of any kind or nature was transmitted, transferred, disclosed, exchanged, or recorded. It includes, without limitation, any oral, written, and Electronically Stored Information that is opened or unopened, active, or deleted.

**186.** "Contribution" means any donation, gift of money, or any other payment, consideration, or thing of value including, without limitation, personally identifiable information or any other personal data.

**187.** "Telemarketing" means any plan, program, or campaign that is conducted to generate or initiate Outbound Telephone Calls by use of a telephone or VoIP-related technology and which involves a telephone call.

**188.** "Traceback Request" means any request to determine the source of a Robocall and/or the voice service providers that dialed, originated, transmitted, or routed a Robocall, which request was made by:

a. A telecommunications carrier or voice service provider;
b. The Industry Traceback Group;
c. A law enforcement agency; or
d. Any other industry organization comprised of telecommunications carriers and/or voice service providers that seek to combat and reduce unlawful Robocalls.

**189.** "Robocall(s)" means a telephone call that delivers artificial or prerecorded voice messages, in whole or in part, including, without limitation, telephone calls utilizing soundboard technology and ringless voicemail messages, whether acting directly or through an intermediary.

**190.** "Telephony Services" means wireline or wireless telecommunications services, including, without limitation: The dialing, origination, termination, routing, or transmission of any telephone calls made over a public switched telephone network;

a. VoIP Services;
b. Electronic messaging services;
c. Ringless voicemail messages; or
d. Any other common carriage, telecommunications, or information services.

## CONCLUSIONS OF LAW

**191.** This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1337(a), 1355, and over the state law claims pursuant to 28 U.S.C. § 1367.

**192.** Venue is proper in this District under 28 U.S.C. §§ 1391(b)(2), (b)(3) and (c), 1395(a), 47 U.S.C. § 227(g)(4), and 15 U.S.C § 6103(e) as a substantial part of the events or omissions giving rise to the claims alleged in the Complaint occurred in this District, and violations alleged in the Complaint occurred in this district.

**193.** Defendants are all "sellers" or "telemarketers" engaged in "telemarketing" as defined by the TSR, 16 C.F.R. § 310.2(dd), (ff), and (gg).

**194.** Pursuant to 15 U.S.C. § 6103(a), the attorney general of any state has the authority to enforce the TSR. The Telemarketing Act further provides, in part:

> Whenever an attorney general of any State has reason to believe that the interests of the residents of that State have been or are being threatened or adversely affected because any person has engaged or is engaging in a pattern or practice of telemarketing which violates any rule of the Commission under section 6102 of this title, the State, as parens patriae, may bring a civil action on behalf of its residents in an appropriate district court of the United States to enjoin such telemarketing, to enforce compliance with such rule of the Commission, to obtain damages, restitution, or other compensation on behalf of residents of such State, or to obtain such further and other relief as the court may deem appropriate.
>
> 15 U.S.C. § 6103(a).

**195.** This Court, in the exercise of its equitable jurisdiction, may award other ancillary relief to remedy injuries caused by some of the Defendants' violations of the TSR. Defendants' telephone calls, made directly or by third parties on their behalf, seeking to sell VSCs to Ohio consumers are "telephone solicitations" as defined by FCC Rule, 47 U.S.C. § 227(a)(4) and 47 C.F.R. § 64.1200(f)(15).

**196.** Call Originator Defendants are "telephone solicitors" as that term is defined in the Ohio TSSA, Ohio Rev. Code § 4719.01(A)(8).

**197.** Call Originator Defendants and Individual Defendants were "suppliers" as defined in Ohio Rev. Code §1345.01(C).

**198.** Call Originator Defendants initiated "telephone solicitations" to "purchasers," as they were at all times relevant herein engaged in initiating "communications" as, or on behalf of, "telephone solicitors" or through "salespersons" to represent the availability of "goods or services," or otherwise induce persons to purchase "goods or services," as those terms are defined in Ohio Rev. Code § 4719.01(A).

**199.** Defendants were engaged in effecting consumer transactions, directly or indirectly, for purposes that are primarily personal, family, or household as defined in Ohio Rev. Code § 1345.01(A).

**200.** As described above, the Defendants operated as a common enterprise and as such are each jointly and severally liable for each other's violations of the TCPA, TSR, CSPA, and TSSA.

**201.** As described above, the Individual Defendants used the Corporate Defendants, with fraudulent intent, as mere facades of themselves. Corporate Defendants showed no respect for corporate formalities, used common resources, and had common employees. As such, this Court pierces the veil and holds Defendants Jones and Yim liable for each of the Corporate Defendants' violations of the TCPA, TSR, CSPA, and TSSA. This Court pierces the veil and holds Defendant Szuromi liable for Defendants Sumco Panama, Sumco USA, and Davis US's violations of the law.

**Count I - Unlawful Robocalls to Cellular Numbers**

**202.** Call Originator Defendants violated 47 U.S.C. § 227(b)(1)(A)(iii) and 47 C.F.R. §§ 64.1200(a)(1)(iii) or 64.1200(a)(2) by initiating calls or causing calls to be initiated to cellular telephone lines using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party and where the call was not initiated for emergency purposes or exempted by rule or order of the Federal Communications Commission under 47 U.S.C. § 227(b)(2)(C).

**203.** Individual Defendants, at all times pertinent hereto, directly or indirectly, controlled and directed the business activities and sales conduct of at least one of the Call Originator Defendants, causing, personally participating in, benefiting from, or ratifying the acts and practices of at least one of the Call Originator Defendants, including the conduct giving rise to the violations described herein, and are therefore liable for said violation of the TCPA.

**204.** Individual Defendants, at all times pertinent hereto, through their acts and practices, showed no respect for the corporate form in creating, controlling, and directing the business activities and sales conduct of at least one of the Call Originator Defendants, performed these acts or practices with fraudulent intent, and are therefore liable for said violation of the TCPA.

**205.** Defendants' violations are willful and knowing.

**206.** The declarations and exhibits submitted by Plaintiff establishes that Call Originator Defendants, and Individual Defendants through their control of, placed, at least, 235,675, 112 pre-recorded vehicle warranty sales calls to Ohio consumers on their cellular telephone lines. Plaintiff's evidence established that these calls were made without prior express consent. YouMail matched 8,672 of the aforementioned calls to complaints submitted to Plaintiff and the FTC by Ohio consumers. Defendants are each jointly and severally liable for each of the 8,672 pre-recorded vehicle warranty sales calls to Ohio consumers in violation of 47 U.S.C. § 227(b)(1)(A)(iii) and 47 C.F.R. §§ 64.1200(a)(1)(iii) or 64.1200(a)(2).

**Count II- Unlawful Robocalls to Residential Numbers**

**207.** In numerous instances, Call Originator Defendants violated 47 U.S.C. § 227(b)(1)(B) and 47 C.F.R. § 64.1200(a)(3), by initiating calls to residential telephone lines using artificial or prerecorded voices to deliver a message without the prior express written consent of the called party and where the call was not initiated for emergency purposes or exempted by rule or order of the Federal Communications Commission under 47 U.S.C. § 227(b)(2)(B).

**208.** Individual Defendants, at all times pertinent hereto, directly or indirectly, controlled and directed the business activities and sales conduct of at least one of the Call Originator Defendants, causing, personally participating in, benefiting from, or ratifying the acts and practices

of at least one of the Call Originator Defendants, including the conduct giving rise to the violations described herein, and are therefore liable for said violation of the TCPA.

**209.** Individual Defendants, at all times pertinent hereto, through their acts and practices, showed no respect for the corporate form in creating, controlling, and directing the business activities and sales conduct of at least one of the Call Originator Defendants, performed these acts or practices with fraudulent intent, and are therefore liable for said violation of the TCPA.

**210.** Defendants' violations are willful and knowing.

**211.** Plaintiff's evidence submitted establishes that Call Originator Defendants, and Individual Defendants through their control of, placed at least 198 artificial or pre-recorded voice vehicle warranty sales calls to Ohio consumers on their residential telephone line. Defendants are each jointly and severally liable for the 198 calls made in violation of 47 U.S.C. § 227(b)(1)(B) and 47 C.F.R. § 64.1200(a)(3).

**Count III - Calls to Numbers on the National DNC Registry**

**212.** In numerous instances, Call Originator Defendants violated 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c)(2) by initiating telephone solicitations to residential telephone subscribers whose telephone numbers were listed on the DNC Registry.

**213.** Individual Defendants, at all times pertinent hereto, directly or indirectly, controlled and directed the business activities and sales conduct of at least one of the Call Originator Defendants, causing, personally participating in, benefiting from, or ratifying the acts and practices of at least one of the Call Originator Defendants, including the conduct giving rise to the violations described herein, and are therefore liable for said violation of the TCPA.

**214.** Individual Defendants, at all times pertinent hereto, through their acts and practices,

showed no respect for the corporate form in creating, controlling, and directing the business activities and sales conduct of at least one of the Call Originator Defendants, performed these acts or practices with fraudulent intent, and are therefore liable for said violations of 47 U.S.C. § 227(c) and 47 C.F.R. § 64.1200(c)(2).

**215.** Defendants' violations are willful and knowing.

**216.** Plaintiff's evidence establishes that Call Originator Defendants, and Individual Defendants through their control thereof, placed at least 17,663,331 calls to numbers of the DNC Registry with an Ohio area code. Defendants did not have an established business relationship or consent to call these individuals. 102,671 of those calls passed YouMail's residency test. As such, Defendants are jointly and severally liable for the 102,671 violations of the TCPA.

**Count IV - Failure to Disclose Caller's Identity**

**217.** In numerous instances, Call Originator Defendants violated 47 U.S.C. § 227(d)(3)(A) and 47 C.F.R. § 64.1200(b)(1) by initiating calls to residential telephone lines using artificial or prerecorded voices to deliver messages that failed to clearly state, at the beginning of the message, the identity of the business, individual, or other entity responsible for initiating the call and the name under which the business entity is registered to conduct business with the State Corporation Commission or the comparable regulatory authority.

**218.** Individual Defendants, at all times pertinent hereto, directly or indirectly, controlled and directed the business activities and sales conduct of at least one of the Call Originator Defendants causing, personally participating in, benefiting from, or ratifying the acts and practices of at least one of the Call Originator Defendants, including the conduct giving rise to the violations described herein, and are therefore liable for said violation of the TCPA.

**219.** Individual Defendants, at all times pertinent hereto, through their acts and practices, showed no respect for the corporate form in creating, controlling, and directing the business activities and sales conduct of at least one of the Call Originator Defendants, performed these acts or practices with fraudulent intent, and are therefore liable for said violation of the TCPA.

**220.** Defendants' violations are willful and knowing.

**221.** Plaintiff's evidence establishes that Call Originator Defendants, and Individual Defendants through their control thereof, initiated calls to telephone numbers using an artificial or prerecorded voice and failed to clearly state at the beginning of the messages the identity of the business responsible for initiating the call. YouMail's representative audio captures demonstrate that the Defendants consistently failed to identify themselves in all of their calls to Ohio consumers. Defendants made at least 102,672 pre-recorded vehicle warranty sales calls that failed to identify the calling party. As such, Defendants are jointly and severally liable for 102,672 violations of 47 U.S.C. § 227(d)(3)(A) and 47 C.F.R. § 64.1200(b)(1).

**Count V - Unlawful Robocalls**

**222.** In numerous instances, in connection with telemarketing, Defendants, acting together through the common enterprise, initiated or caused others to initiate outbound telephone calls that delivered prerecorded messages without the express consent, in writing, of the call recipient in violation of 16 C.F.R. § 310.4(b)(1)(v).

**223.** Plaintiff's evidence establishes that the Defendants, acting as a common enterprise, initiated at least 102,672 prerecorded vehicle warranty calls to Ohio consumers. Plaintiff requested $500 per call for 8,672 calls that were matched to complaints made by Ohio consumers. Defendants are jointly and severally liable for 8,672 violations of 16 C.F.R. § 310.4(b)(1)(v).

## Count VI – Misleading Representations

**224.** In numerous instances, in connection with telemarketing, Defendants, acting together through the common enterprise, made or caused others to make deceptive outbound telephone calls that misrepresented the nature and central characteristics of the service being offered in violation of 16 C.F.R. § 310.3(a)(2)(iii).

**225.** In numerous instances, in connection with telemarketing, Defendants, acting together through the common enterprise, made or caused others to make deceptive outbound telephone calls that misrepresented the nature and central characteristics of the service being offered in violation of 16 C.F.R. § 310.3(a)(2)(iii).

**226.** In numerous instances, in connection with telemarketing, Defendants, acting together through the common enterprise, made or caused others to make deceptive outbound telephone calls that included false or misleading statements to induce consumers to purchase goods or services in violation of 16 C.F.R. § 310.3(a)(4).

**227.** Plaintiff's evidence established that Defendants initiated at least 102,672 prerecorded vehicle warranty calls to Ohio consumers. Plaintiff also established a representative sample of the content of those messages. At no point did Defendants accurately identify the product they were selling, their relationship to the Ohio consumer, and the product they were selling. Plaintiff requested $500 per call for 8,672 for the consumers that submitted complaints to Plaintiff or the FTC. As such, defendants are liable for 8,672 violations of 16 C.F.R. §§ 310.3(a)(2)(iii) and (a)(4).

## Count VII - Failure to Honor Do Not Call Requests

**228.** In numerous instances, in connection with telemarketing, Defendants, acting together

through the common enterprise, initiated or caused others to initiate outbound telephone calls to persons who had previously stated that they did not wish to receive calls made by or on behalf of the seller whose goods or services were being offered in violation of 16 C.F.R. § 310.4(b)(1)(iii)(A).

**229.** Plaintiff's evidence established that YouMail matched 20,934 call records to Ohio individuals who previously asked not to be called by the Defendants. These 20,934 call record matches represent calls made to Ohio consumers 31 days or more after they asked to not be called again by the Defendants. As such, Defendants are liable for 20,934 violations of 16 C.F.R. § 310.4(b)(1)(iii)(A).

**Count VIII - Failure to Transmit Accurate Caller ID**

**230.** In numerous instances, in connection with telemarketing, Defendants, acting together through the common enterprise, failed to transmit or caused to not be transmitted an accurate telephone number, and the name of the telemarketer or seller, when made available by the call recipient's service provider, to any caller identification service in use by call recipients, in violation of 16 C.F.R. § 310.4(a)(8).

**231.** Plaintiff's evidence establishes that Defendants are liable for 8,672 violations of 16 C.F.R.§ 310.4(a)(8). Defendants used over 36 million unique phone numbers to call Ohio consumers. 98.8% of those phone numbers had an Ohio area code. Defendants used local area codes to trick consumers into believing they were being called from a local number and therefore were more likely to pick up and purchase Defendants' worthless product. Defendants had no right to use over 36 million unique Ohio phone numbers; if an Ohio consumer called back the number that called them, they were not connected to the Defendants. Because Defendants engaged in prolific spoofing and snowshoeing, Defendants are jointly and severally liable for 8,672 violations of 16 C.F.R. §

310.4(a)(8).

**Count IX - Violations of the Ohio Consumer Sales Practices Act**

**232.** The Ohio CSPA, Ohio Rev. Code § 1345.02 prohibits "suppliers" from engaging in unfair or deceptive consumer sales acts or practices.

**233.** Call Originator Defendants and Individual Defendants are "suppliers" as defined in Ohio Rev. Code § 1345.0l(C), since Defendants engage in the business of effecting "consumer transactions," either directly or indirectly, for purposes that are primarily personal, family, or household within the meaning as specified in Ohio Rev. Code § 1345.01(A) of the Ohio CSPA.

**234.** Individual Defendants at all times pertinent hereto, directly or indirectly, controlled and directed the business activities and sales conduct of at least one Call Originator Defendant, causing, personally participating in, benefiting from, or ratifying the acts and practices of at least one Call Originator Defendant, including the conduct giving rise to the violations described herein.

**235.** Unless issued by an insurer as authorized or eligible to do business in Ohio under Ohio Rev. Code § 3905.42, the sale of a motor vehicle service contract is a "consumer transaction" for purposes of the Ohio CSPA.

**236.** In numerous instances over the previous two years, Call Originator Defendants and Individual Defendants violated Ohio's CSPA, Ohio Rev. Code § 1345.02(A) and (B)(1), by initiating telephone solicitations, directly or as a result of a third party acting on their behalf, which deceptively represented that the subject of the transaction had sponsorship, characteristics, benefits, particular standards, qualities or affiliations that it did not have.

**237.** In numerous instances over the previous two years, Call Originator Defendants and Individual Defendants violated Ohio's CSPA, Ohio Rev. Code § 1345.02(A) and (B)(2), by initiating telephone solicitations, directly or as a result of a third party acting on their behalf, which

deceptively represented that the subject of the transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not.

**238.** In numerous instances over the previous two years, Call Originator Defendants and Individual Defendants violated Ohio's CSPA, Ohio Rev. Code § 1345.02(A) and (B)(9), by initiating telephone solicitations, directly or as a result of a third party acting on their behalf, which deceptively represented that the supplier has a sponsorship, approval, or affiliate that the supplier does not have.

**239.** In numerous instances over the previous two years, Call Originator Defendants and Individual Defendants violated Ohio's CSPA, Ohio Rev. Code § 1345.02(A), by initiating telephone solicitations, directly or as a result of a third party acting on their behalf, that unfairly or deceptively misrepresented the caller's ID by spoofing, which is the falsifying or disguising the identity of the telemarketer.

**240.** In numerous instances over the previous two years, Call Originator and Individual Defendants violated Ohio's CSPA, Ohio Rev. Code § 1345.02(A), by initiating telephone solicitations, directly or as a result of a third party acting on their behalf, that unfairly or deceptively misrepresented the caller's ID by rotating millions of phone numbers to be displayed on caller ID in the act known as snowshoeing, in an effort to frustrate consumers' efforts to screen, block, or otherwise avoid calls.

**241.** The acts or practices described in paragraphs 178-184 above have been previously determined by an Ohio court to violate the CSPA, Ohio Rev. Code § 1345.01 et seq. Defendants committed said violations after such decision was available for public inspection pursuant to Ohio Rev. Code § 1345.05(A)(3).

**242.** Plaintiff's evidence established that at least 8,672 calls to Ohio consumers violate the

CSPA in five ways. The CSPA provides $200 per violation. Three of those violations were entered into Plaintiff's Public Inspection File ("PIF") prior to the Defendants acts and practices, pursuant to Ohio Rev. Code §1345.05(A)(3). Because Plaintiff's established five violations of the CSPA, three of while were in PIF prior to the actions described in the Complaint, Defendants are jointly and severally liable for $200.00 and $25,000.00 as a civil penalty for each of the three violations previously entered in PIF.

**Count X - Violations of Ohio's Telephone Solicitation Sales Act**

**243.** The Ohio TSSA, Ohio Rev. Code § 4719.01 et seq., requires nonexempt telephone solicitors that conduct telephone solicitations in Ohio to register with and file a copy of a surety bond with the Ohio Attorney General.

**244.** Call Originator Defendants are "telephone solicitors" as that term is defined in the Ohio TSSA, Ohio Rev. Code § 4719.01(A)(8), as they were, at all times relevant herein, engaged in initiating telephone solicitations, directly or through one or more salespersons, either from a location in Ohio or from a location outside Ohio to persons in Ohio. "Telephone solicitor" includes, but is not limited to, any such person that is an owner, operator, officer, or director of, partner in, or other individual engaged in the management activities of a business. Ohio Rev. Code § 4719.01(A)(8).

**245.** Call Originator Defendants initiated "telephone solicitations" to "purchasers," as they were at all times relevant herein engaged in initiating "communications" as, or on behalf of, "telephone solicitors" or through "salespersons" to represent the availability of "goods or services," or otherwise induce persons to purchase "goods or services," as those terms are defined in the Ohio TSSA, Ohio Rev. Code § 4719.01(A).

**246.** At all times relevant to the Complaint, none of the Call Originator Defendants were

registered as telephone solicitors with the Ohio Attorney General's Office pursuant to the Ohio TSSA, Ohio Rev. Code § 4719.02(A).

**247.** In numerous instances over the previous two years, Call Originator Defendants committed unfair or deceptive acts and practices in violation of Ohio's CSPA, Ohio Rev. Code § 1345.02(A) and Ohio's TSSA, Ohio Rev. Code § 4719.02(A), by acting as telephone solicitors without first having obtained certificates of registration from the Ohio Attorney General. These acts or practices have been previously determined by an Ohio court to violate the Ohio CSPA. Defendants committed said violations after such decisions were available for public inspection pursuant to Ohio Rev. Code § 1345.05(A)(3).

**248.** At all times relevant herein, Call Originator Defendants failed to have surety bonds on file with the Ohio Attorney General's Office as required by the Ohio TSSA, Ohio Rev. Code § 4719.04(A).

**249.** In numerous instances over the previous two years, Call Originator Defendants violated Ohio's TSSA, Ohio Rev. Code § 4719.04(A), by acting as a telephone solicitor without first having obtained and filed with the Ohio Attorney General a surety bond issued by a surety company authorized to do business in the State of Ohio.

**250.** Individual Defendants at all times pertinent hereto controlled and directed the business activities and sales conduct of at least one of the Call Originator Defendants, causing, personally participating in, benefiting from, or ratifying the acts and practices of at least one of Call Originator Defendants, including the conduct giving rise to the violations described herein, and are therefore liable for said violations of the TSSA.

**251.** Defendants' acts and practices as described in Count IX violate the Ohio CSPA, Ohio Rev. Code § 1345.01 et seq., in the manner described, and that the violations alleged in paragraphs

178-184 occurred after decisions from Ohio courts determining those acts or practices violative of the Ohio CSPA were available for public inspection pursuant to Ohio Rev. Code § 1345.05(A)(3).

**252.** Defendants committed two violations of the TSSA. Defendants are each jointly and severally liable for both violations of the TSSA. Plaintiff asked this Court for the full $25,000.00 per violation as permitted by Ohio Rev. Code § 4719.12(B).

## III. LAW & ANALYSIS

Rule 55 of the Federal Rules of Civil Procedure governs defaults and default judgments. *See* Fed. R. Civ. P. 55. The first step is entry of default. "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." Fed. R. Civ. P. 55(a). Once default is entered, a party may take the second step by moving for default judgment. Fed. R. Civ. P. 55(b). At the default judgment stage, "the complaint's factual allegations regarding liability are taken as true, while allegations regarding the amount of damages must be proven." *Arthur v. Robert James & Assocs. Asset Mgmt., Inc.*, 2012 WL 1122892, at *1 (S.D. Ohio Apr. 3, 2012) (internal quotation marks omitted). It is axiomatic that "[a]n entry of default does not automatically entitle the plaintiff to a default judgment." *Methe v. Amazon.com.dedc, LLC*, 2019 WL 3082329, at *1 (S.D. Ohio July 15, 2019). Generally, "[t]he plaintiff must still show that, when all of the factual allegations in the complaint are taken as true, the defendant is liable for the claim(s) asserted." *Id.*; *see also F.C. Franchising Sys., Inc. v. Schweizer*, 2012 WL 1945068, at *3 (S.D. Ohio May 30, 2012) ("[I]t remains for the district court to consider whether the unchallenged facts constitute a cause of action, since a party in default does not admit mere conclusions of law." (quoting *Marshall v. Baggett,* 616 F.3d 849, 852 (8th Cir. 2010)). When considering whether to enter default judgment, the Sixth Circuit instructs courts to consider the following factors:

> (1) possible prejudice to the plaintiff; (2) the merits of the claims; (3) the sufficiency of the complaint; (4) the amount of money at stake; (5) possible disputed material facts; (6) whether the default was due to excusable neglect; and (7) the preference for decisions on the merits.

*Russell v. City of Farmington Hills*, 34 F. App'x 196, 198 (6th Cir. 2002) (citing *Eitel v. McCool,* 782 F.2d 1470, 1472 (9th Cir. 1986); *Berthelsen v. Kane*, 907 F.2d 617, 620 (6th Cir. 1990); and *Shepard Claims Serv., Inc. v. William Darrah & Assocs*., 796 F.2d 190, 193–94 (6th Cir. 1986)). Here, Plaintiff properly applied for an entry of default after Defendants failed to answer Plaintiff's Complaint and the Clerk entered Defendant's default. Next, this Court will address the Russell factors, beginning with the sufficiency of the Complaint and the merits of the claims.

*1. Sufficient and Meritorious Claims*

Plaintiff alleges violations of the Telephone Consumer Protection Act ("TCPA"), the Federal Trade Commission's Telemarketing Sales Rule ("TSR"), the Ohio Consumer Sales Practices Act ("CSPA"), and the Ohio Telephone Solicitation Sales Act ("TSSA"). Taking the factual allegations as true, this Court finds that the Complaint states sufficient and meritorious claims against Defendant for all counts.

a. *TCPA Claims*

Count I alleges that the Call Originator Defendants initiated, or caused to be initiated, calls to cellular telephone numbers using artificial or prerecorded voices without the called parties' prior express consent. (Compl. ¶ 157). Such conduct violates 47 U.S.C. § 227(b)(1)(A)(iii) and 47 C.F.R. §§ 64.1200(a)(1)(iii) and 64.1200(a)(2). The Complaint alleges that Defendants operated a widespread robocalling campaign through which prerecorded messages advertising vehicle service contracts were delivered to Ohio consumers without valid consent. (*Id.* ¶¶ 42-50). The Complaint

therefore adequately alleges that Defendants used artificial or prerecorded voices to call cellular telephone numbers without prior express consent.

Count II alleges that the Call Originator Defendants initiated calls to residential telephone lines using artificial or prerecorded voices without the recipients' prior express written consent. (*Id.* ¶ 161). The Complaint further alleges that the recipients had not agreed in writing to receive those calls. (*Id.*). Those allegations state a meritorious claim under § 227(b)(1)(B).

Count III alleges that the Call Originator Defendants initiated telephone solicitations to residential subscribers whose telephone numbers appeared on the National Do Not Call Registry. (*Id.* ¶ 165). The Complaint alleges that Defendants initiated at least 250 million calls to telephone numbers with Ohio area codes that appeared on the Registry and that numerous Ohio consumers received calls despite having registered their numbers. (*Id.* ¶¶ 77).

Count IV alleges that Defendants' prerecorded messages failed to identify the business or entity responsible for initiating the calls. (*Id.* ¶ 169). The Complaint alleges that Defendants identified themselves only through generic descriptions such as the "vehicle service department," failed to disclose the seller or telemarketer on whose behalf the calls were placed, and concealed the source of the calls through spoofing and other practices. (*Id.* ¶¶ 46, 56-57). These allegations establish a violation of 47 U.S.C. § 227(d)(3)(A) and 47 C.F.R. § 64.1200(b)(1).

b. *TSR Claims*

Count V alleges that Defendants, acting through the common enterprise, initiated or caused others to initiate outbound telemarketing calls that delivered prerecorded messages without the recipients' express written consent. (*Id.* ¶ 173). The Complaint alleges that Defendants generated sales leads through prerecorded calls advertising vehicle service contracts and that the call

recipients had not executed written agreements authorizing such calls. (*Id*. ¶¶ 43–49). These allegations establish a violation of 16 C.F.R. § 310.4(b)(1)(v).

Count VI alleges Defendants misrepresented the nature and central characteristics of the services being offered, in violation of 16 C.F.R. § 310.3(a)(2)(iii). (Compl. ¶ 174). The Complaint alleges that Defendants falsely represented that they were calling from or on behalf of consumers' vehicle manufacturers or dealers, knew that consumers' original warranties were about to expire, could extend or reinstate those warranties, and were following up on existing consumer files or business relationships. (*Id.* ¶¶ 48-49). In reality, Defendants allegedly were generating leads for the sale of vehicle service contracts, had no relationship with the consumers' manufacturers or dealers, did not know the status of the consumers' warranties, and lacked authority to extend or reinstate a manufacturer's warranty. (*Id.*).

Count VII alleges that Defendants continued calling consumers who previously had stated that they did not wish to receive further calls. (*Id.* ¶ 176). The Complaint alleges that Defendants' prerecorded messages instructed consumers to press a number to be placed on a do-not-call list, but Defendants continued calling consumers who followed that instruction or otherwise requested that the calls stop. This is a direct violation of 16 C.F.R. § 310.4(b)(1)(iii)(A).

Count VIII alleges that Defendants failed to transmit accurate caller-identification information. (*Id*. ¶ 177). The Complaint alleges that Defendants used spoofing, neighbor spoofing, and snowshoeing to transmit inaccurate or misleading telephone numbers, obscure the identity of the calling party, evade call-blocking systems, and make calls appear local. (*Id*. ¶ 61). These allegations establish that Defendants failed to transmit an accurate telephone number and the name of the telemarketer or seller as required by 16 C.F.R. § 310.4(a)(8).

c. *Ohio CSPA Claims*

Count IX alleges that the Defendants are suppliers who engaged in "unfair or deceptive consumer sales acts or practices." (*Id.* ¶ 178-84). Ohio Rev. Code Ann. § 1345.02 (West). The Complaint identifies several actionable deceptive practices. Defendants allegedly represented that the offered service possessed sponsorship, characteristics, benefits, standards, qualities, or affiliations that it did not possess. (*Id.* ¶ 182); *see* Ohio Rev. Code Ann. § 1345.02(B)(1) (West 2026). Defendants allegedly represented that the offered service was of a particular standard, quality, grade, style, prescription, or model, when it was not. (*Id.* ¶ 183); *see* Ohio Rev. Code § 1345.02(B)(2) (West 2026). Defendants also allegedly represented that they possessed sponsorship, approval, or affiliations that they did not possess. (*Id.* ¶ 184); *see* Ohio Rev. Code § 1345.02(B)(9) (West 2026). All these allegations describe unfair or deceptive acts or practices prohibited by Ohio Rev. Code § 1345.02 (B).

d. *Ohio TSSA Claim*

Finally, Count X alleges that the Call Originator Defendants conducted telephone solicitations in Ohio without registering with the Ohio Attorney General or filing the required surety bonds. (Compl. ¶ 193). Their alleged failure to register and to file surety bonds violates Ohio Rev. Code Ann. §§ 4719.02(A) and 4719.04(A). The Complaint also alleges that the Individual Defendants controlled, participated in, benefited from, or ratified this conduct. (Compl. ¶199). These allegations state a sufficient and meritorious TSSA claim.

2. *Prejudice to the Plaintiff*

Having determined that the Plaintiff's claims are sufficient and meritorious, this Court now has to consider possible prejudice to the Plaintiff if default judgment is not granted. This Court finds that Plaintiff is likely to be prejudiced were its motion denied. Plaintiff has expended

significant resources over four years to serve all Defendants with a copy of the complaint—including those located in foreign countries. Were the motion to be denied, Plaintiff would continue to incur more costs towards this matter. Denying the motion would also unnecessarily encourage future defendants' avoidance of litigation and reward the present Defendants' current avoidance of this litigation. *See Evans Adhesive Corp. v. Golden State Adhesives, Inc.*, 2023 U.S. Dist. LEXIS 194079, *7 (S.D. Ohio Oct. 30, 2023). This Court finds that this factor weighs in favor of the Plaintiff.

*3. Amount of Money at Stake*

Next, this Court considers the amount of money at stake. Plaintiff alleges damages of $83,716,500.00 and argues that this amount is comparable to those at issue in *United States v. Williams*, 2024 U.S. Dist. LEXIS 46684, at *2 (E.D. Ky. Mar. 18, 2024), and *Bds. of Trs. of the Ohio Laborers' Bens. v. Karnak Concrete LLC*, 2024 U.S. Dist. LEXIS 120120, at *9 (S.D. Ohio July 9, 2024). But the amounts at stake in those two cases combined totaled approximately $1 million. Here, Plaintiff seeks more than eighty-three times that amount. Accordingly, this factor does not weigh in Plaintiff's favor.

4. *Possible Disputed Facts*

As it comes to the possibility of disputed facts, the Defendants have failed to give this court anything to evaluate due to their non-participation. By virtue of failing to respond to the Plaintiffs' Complaint, Defendants cannot dispute any of Plaintiffs' allegations. *See Tomlison v. E. Recovery Grp., LLC, 2019 WL1380313, at *4 (E.D. Mich, Mar 27, 2019).* Defendants have also failed to respond to Plaintiff's Motion for Default Judgment. This factor undeniably weighs in favor of the Plaintiff.

*5. Default Due to Excusable Neglect*

It is not apparent whether excusable neglect played a role in the Defendants' default in this case. Despite every Defendant being properly served, none responded to the Complaint or the Motion for Default Judgment. Because the reasons for the Defendants' silence are unknown, this Court treats this factor as neutral.

*6. Preference for Decision on the Merits*

Finally, the Court must consider "the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits." *Eitel v. McCool*, 782 F.2d 1470, 1472 (9th Cir. 1986). Inevitably, this factor is in tension with default judgment. Where trial on the merits is not attainable, however, courts recognize that this policy preference must yield to the needs of litigants actually before them. *See, e.g.*, *Toler v. Glob. Coll. of Nat. Med., Inc.*, 2016 WL 67529, at *9 (E.D. Mich. Jan. 6, 2016) ("[W]hile public policy favors resolution of cases on the merits, Defendants and their Counsel have consistently ignored opportunities for a merits-based resolution by refusing to respond in this matter . . . . 'Effective judicial administration requires that at some point disputes be treated as finally and definitively resolved.'" (quoting 10A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 2693 (3d ed.). Because the majority of the *Russell* factors weigh in the Plaintiffs' favor, and since a decision on the merits is neither realistic nor attainable in this case, policy preferences will not preclude Plaintiff's requested relief. Therefore, Plaintiff's Motion for Default Judgment (ECF No. 203) is **GRANTED**.

## **ORDER**

### **I. COMPLIANCE WITH FEDERAL AND STATE LAW**

**IT IS ORDERED** that Defendants, whether acting directly or indirectly, are

permanently restrained and enjoined from engaging in violations of, or from consulting, brokering, planning, investing, receiving commissions from, or advising regarding conduct that violates the TCPA, the TSR, the Ohio CSPA, the Ohio TSSA, and other applicable and relevant federal and Ohio laws or regulations.

## II. PERMANENT BAN ON ROBOCALLS AND TELEMARKETING CALLS; PERMANENT BAN ON THE PROVISION OF TELEPHONY AND VOIP SERVICES FOR ROBOCALLS AND TELEMARKETING CALLS

**IT IS FURTHER ORDERED** that Defendants are permanently restrained and enjoined from operating, owning, investing in, being an employee of, drawing revenue from, or consulting with a Voice Service Provider that uses the U.S. telephone system, or causes to use the U.S. telephone system, to make, initiate, transmit, or otherwise route any Outbound Telephone Call that plays or delivers Robocalls or Telemarketing Calls, and are permanently restrained and enjoined from providing VoIP Services or Telephony Services to another Person that uses the U.S. telephone system, to make, initiate, transmit, or otherwise route any Outbound Telephone Call that plays or delivers Robocalls or Telemarketing Calls.

**IT IS ORDERED** that Defendants and their companies (including subsidiaries or affiliates), officers, agents, employees, and all other Persons in active concert or participation with them, whether acting directly or indirectly, is permanently restrained and enjoined from engaged in:

A. Initiating or causing others to initiate an Outbound Telephone Call that plays or delivers a Robocall;

B. To engage in, direct, or otherwise participate in Lead Generation or cause others to engage in or participate in Lead Generation; and Controlling, holding a managerial post in, consulting for, serving as an officer of, having any revenue sharing agreement with, or

holding any ownership interest, share, or stock in any company or Person that engages in conduct prohibited in Sections A-B above; *provided, however*, that it is not a violation of the Order to own a non-controlling interest in a publicly traded company that engages in such conduct.

**IT IS FURTHER ORDERED** that Defendants are permanently restrained and enjoined from engaging in or consulting, brokering, planning, investing, receiving commissions from, or advising regarding any of the following conduct:

A. Receiving or sending payments, or causing others to receive or send payments in connection with any illegal or fraudulent telephone calls, including, but not limited to, payments from any victim or other Person targeted by an illegal or fraudulent telephone call;

B. Providing any Telephony Services to another Person that uses the U.S. telephone system, or causes or assists and facilitates others to use the U.S. telephone system, to make, initiate, transmit, or otherwise route any Outbound Telephone Call that plays or delivers Robocalls or Telemarketing Calls;

C. Providing any VoIP Services to another Person that uses the U.S. telephone system, or causes or assists and facilitates others to use the U.S. telephone system, to make, initiate, transmit, or otherwise route any Outbound Telephone Call that plays or delivers Robocalls or Telemarketing Calls;

D. Acting as an employee, agent, volunteer, contractor, or consultant for any Person that Defendants know or should know is engaged in the conduct described in this Section;

E. Controlling, holding a managerial post in, serving as an officer of, having any revenue sharing agreement with, or holding any ownership interest, share, or stock in any

Person that Defendants know or should know is engaged in the conduct described in this Section; and

F. Using any Person to engage in conduct described in this Section.

## III. DECLARATORY JUDGMENT

The Court hereby **DECLARES** that the acts and practices described above violate the CSPA, Ohio Rev. Code § 1345.01, *et seq.* and the TSSA, Ohio Rev. Code § 4719.01 *et seq.*, in the manner set forth in the Complaint.

## IV. MONETARY JUDGMENT

**IT IS FURTHER ORDERED** that:

A. As to TCPA Count I, Defendants are jointly and severally liable for, and ORDERED to pay, a civil penalty to the Ohio Attorney General's Office in the total amount of $4,336,000.00, to be deposited into the Consumer Protection Enforcement Fund.

B. As to TCPA Count II, Defendants are jointly and severally liable for, and ORDERED to pay, a civil penalty to the Ohio Attorney General's Office in the total amount of $99,000.00, to be deposited into the Consumer Protection Enforcement Fund.

C. As to TCPA Count III, Defendants are jointly and severally liable for, and ORDERED to pay, a civil penalty to the Ohio Attorney General's Office in the total amount of $51,335,500.00, to be deposited into the Consumer Protection Enforcement Fund.

D. As to TCPA Count IV , as provided by 47 U.S.C. § 227(g), Defendants are jointly and severally liable for, and ORDERED to pay, a civil penalty to the Ohio Attorney General's Office in the total amount of $4,336,000.00, to be deposited into the Consumer

Protection Enforcement Fund.

E. As to TSR Count V Defendants are jointly and severally liable for, and ORDERED to pay, a civil penalty to the Ohio Attorney General's Office in the total amount of $4,336,000.00 to be deposited into the Consumer Protection Enforcement Fund.

F. As to TSR Count VI, Defendants are jointly and severally liable for, and ORDERED to pay, a civil penalty to the Ohio Attorney General's Office in the total amount of $4,336,000.00, to be deposited into the Consumer Protection Enforcement Fund.

G. As to TSR Count VII, Defendants are jointly and severally liable for, and ORDERED to pay, a civil penalty to the Ohio Attorney General's Office in the total amount of $10,467,000.00, to be deposited into the Consumer Protection Enforcement Fund.

H. As to TSR Count VIII, Defendants are jointly and severally liable for, and ORDERED to pay, a civil penalty to the Ohio Attorney General's Office in the total amount of $4,336,000.00, to be deposited into the Consumer Protection Enforcement Fund.

I. As to CSPA Count IX, pursuant to Ohio Rev. Code § 1345.07(A)(l), Defendants are ordered to pay a statutory penalty in the amount $25,000.00 for each of the three violations of the Ohio CSPA in PIF prior to Defendants' acts and practices, resulting in a total amount of $75,000.00to be deposited into the Consumer Protection Enforcement Fund.

J. Defendants are jointly and severally liable for, and ORDERED to pay, pursuant to Ohio Rev. Code § 4719.12, civil penalties to the Ohio Attorney General's Office, in the amount of $25,000.00 for each violation of the two violations of the Ohio TSSA, resulting in a total amount of $50,000.00, to be deposited into the Consumer Protection Enforcement Fund.

K. Judgment in the amount of **$83,716,500.00** is entered in favor of Plaintiff and against Defendants, jointly and severally, as a civil penalty.

L. Defendants are ordered to pay to Plaintiff the amount of $83,716,500.00. Such payment must be made within ten (10) business days following the Court's entry of this Order. Such payment shall be made to Plaintiff by electronic fund transfer in accordance with instructions to be provided by a representative of Plaintiff.

M. Unless otherwise directed by Plaintiff, all payments shall be made to the Ohio Attorney General's Office via certified check or money order, made payable to the "Ohio Attorney General's Office" and delivered to:

Finance Specialist
Consumer Protection Section
Office of the Ohio Attorney
General 30 East Broad Street,
14th Floor, Columbus, Ohio
43215

N. Failure to pay any amounts under this Default Judgment when due may result in any balance being referred to the Ohio Attorney General's Collection Enforcement Section for collection. Should this occur, the Collections Enforcement Section will assess additional collection costs and interest on the unpaid balance pursuant to Ohio law, including, but not limited to Ohio Rev. Code §§ 131.02, 109.08, and 109.081.

O. **IT IS FURTHER ORDERED** that in the event the Ohio Attorney General must initiate legal action or incur any costs to compel Defendants to abide by this Default Judgment, the Defendants shall be liable to the Ohio Attorney General, should he prevail, for all related enforcement costs, including, but not limited to, a reasonable sum for attorneys' fees, investigative costs, and interest and collection costs as permitted by statute.

P. Defendants shall pay all court costs associated with this matter.

Q. This Court shall retain jurisdiction to enforce compliance with this Consent Judgment.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**UNITED STATES DISTRICT JUDGE**

**DATED: August 11, 2026**